Douglas A. HENNIG, Plaintiff-Appellant-Cross-Respondent,

v.

Lance W. AHEARN and Heartland Development Corporation, Defendants-Respondents-Cross-Appellants.†

Court of Appeals

*No. 98–2319. Submitted on briefs June 4, 1999.—Decided August 26, 1999.*

(Also reported in 601 N.W.2d 14.)

†Petition to review denied.

153

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *Donald K. Schott* and *Valerie Bailey-Rihn* of *Quarles & Brady, LLP*, Madison.

On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the briefs of *Edward A. Hannan* and *Alexander E. Gasser* of *Hannan, Siesennop & Sullivan*, Milwaukee.

Before Dykman, P.J., Roggensack and Deininger, JJ.

DEININGER, J.   Douglas Hennig appeals an order dismissing his misrepresentation and contract reformation claims against Heartland Development Corporation and its president, Lance Ahearn.[1] Hennig claims that during the negotiation of an executive compensation agreement, Ahearn altered a crucial provision of the agreement at the last minute but failed to point out the alteration, as had been the practice with revisions during earlier phases of the negotiation. On Ahearn's motion at the close of Hennig's case, the

---

[1] Although both Ahearn and Heartland Development are parties to the action and this appeal, we will refer to them as "Ahearn," except where it is necessary to separately identify them.

154

trial court dismissed the latter's claims. The trial court concluded that Ahearn had no duty to disclose the alteration, and that Hennig's negligence in failing to detect the alteration barred his claims as a matter of law. We conclude, however, that Hennig presented credible evidence at trial showing that his claims turn on disputed facts; that the parties' conduct during the course of the negotiation may have given rise to a duty on Ahearn's part to disclose alterations to the agreement; and that, in light of the parties' conduct, Hennig's failure to discover the last-minute alteration might not bar his recovery. Accordingly, we reverse the order dismissing Hennig's claims and remand them for trial.

Hennig also cites as errors the trial court's exclusion of testimony from Hennig's attorney regarding why he did not reread the entire document after the final version was forwarded to him, and the court's refusal to permit testimony from Hennig's expert regarding the customs of the business and legal communities. We conclude that the trial court's exclusion of this testimony was based on an erroneous view of the law, and we instruct the court on remand to admit the testimony at trial.

Ahearn cross-appeals the trial court's denial of his motion for summary judgment. We affirm the trial court's ruling because genuine issues of material fact were shown to be disputed, precluding dismissal of Hennig's claims on summary judgment. Ahearn also cross-appeals the trial court's denial of his motion for sanctions against Hennig for maintaining a frivolous action. We conclude that Hennig's claims are not frivolous, and we thus affirm the trial court's order denying sanctions.

## BACKGROUND

Hennig claims that during the negotiation of a contract, Ahearn altered a crucial paragraph that established Hennig's compensation, but that Ahearn failed to point out the alteration, as had been the custom of the parties and their attorneys during earlier phases of the negotiation. Although Hennig and his attorney reviewed the final draft of the contract, neither noticed the crucial alteration. Hennig signed the contract and later received substantially less compensation than he expected. He now seeks damages in tort, or reformation of the contract, hoping to obtain the compensation specified in earlier drafts of the contract.

As we discuss in more detail below, the general rule is that a party who signs a contract after a fair opportunity to read the contract is bound by its terms. This rule is subject to exceptions, however, and a party's failure to carefully read a contract does not in every case bar relief from the contract as signed. The principal question before us is whether Hennig produced sufficient evidence in support of his tort and contract theories for his claims to survive Ahearn's motion to dismiss. With this in mind, we now review in some detail the evidence adduced during Hennig's presentation of his case to the jury. Many relevant facts were undisputed, but some crucial facts were very much in dispute.

Hennig founded a small business, and in order to raise capital to expand it, he engaged in a series of transactions with Heartland Development Corporation. Hennig's company became Heartland Retirement Services, with Hennig serving as president and owning 4.5% of the company's stock. Heartland Development owned the remaining 95.5% of the stock. Ahearn was president of Heartland Development. In July 1995,

Heartland Development decided to sell Heartland Retirement. Ahearn believed that Heartland Retirement would garner a higher price if the company were sold with established management in place. Accordingly, Ahearn was prepared to offer Hennig an incentive payment if Hennig would commit to assisting in the sale and to continuing his employment with the buyer. Thus began negotiations between Hennig and Ahearn, and their attorneys, which led to the current dispute.

Hennig and Ahearn first discussed Hennig's incentive payment in July 1995. Terms of the incentive payment were expressed in a letter from Ahearn to Hennig dated October 11, 1995, which provided that Hennig's incentive payment would be calculated as a percentage of the money Heartland Development would realize from the sale. The October 11 letter provided, in relevant part:

> *You will receive a percent of the net equity realized* in the transaction as follows:
>
> For amounts up to $3 million - 3%
>
> For amounts greater than $3 million up to $4 million - 4% of the total
>
> For amounts greater than $4 million up to $5 million - 5% of the total
>
> For amounts greater than $5 million - 5 1/2% of the total net equity
>
> The attached schedule gives an example of the amounts you would receive (given certain pricing assumptions) for both incentive awards and equity you own. You will note that for amounts in excess of $5 million net, you will receive a total of 10% for both owned equity and incentive award.

157

(Emphasis added.) The term "net equity realized" was not specifically defined in the letter. The schedule attached to the letter, however, indicated that "net equity realized" amounted to the gross sales price, less outstanding debt, the commission to the brokers of the sale, and Hennig's 4.5% share of the equity.

The first draft of the agreement itself was prepared by Ahearn's attorney and presented to Hennig on November 16, 1995. Hennig retained his own attorney to review the proposed agreement and to advise him during the negotiations. Between November 16 and November 30, the attorneys exchanged five drafts of the proposal. Each side proposed numerous changes, and each draft highlighted the differences between the current draft and that side's prior proposal. Ahearn and his attorney presented the November 30 draft to Hennig's attorney, indicating that it was their final offer.

From Ahearn's October 11 letter to the November 30 draft, the incentive compensation arrangement was essentially unchanged. The definition of "net equity realized" was refined, but only to clarify how it would be calculated in the event the sale were structured as a stock sale rather than an asset sale. Paragraph 4 of the November 30 draft provided, in relevant part:

> For purposes of this determination [of Hennig's incentive compensation], "Net Equity Realized" means 100% of the price received by Heartland Development Corporation in the Sale (in the event of a Stock Sale) or 95.5% of the price paid by the Purchaser in the Sale (in the event of an Asset sale), less (i) Company debt or other obligations of the Company which are not assumed by Purchaser as part of the Sale and (ii) fees and expenses incurred by the Company in connection with the Sale, includ-

ing but not limited to, attorneys' fees, accountants' fees, environmental audit fees, and fees or commissions payable to investment bankers or brokers for services in connection with the Sale. The gross remuneration paid under this section shall, as determined by the Company, be subject to applicable withholding and payroll taxes.

Thus, under the terms of the November 30 draft, net equity realized retained essentially the same meaning it had in Ahearn's October 11 letter: the gross amount received by Heartland Development from the sale, less outstanding debt not assumed by the purchaser, and less the costs of conducting the sale.

Over the weekend of December 2–3, however, Ahearn had second thoughts about the compensation arrangement that had been offered to Hennig in the November 30 draft. After discussing the matter with Heartland Development's chief financial officer, Ahearn changed the definition of "net equity realized," without his attorney's assistance or knowledge. On Tuesday, December 5, 1995, Ahearn delivered the final version of the agreement to Hennig—on Heartland Retirement letterhead and already signed by Ahearn—without explaining or pointing out any of the several changes that had been made to the document. The relevant passage from paragraph 4 as delivered to Hennig read:

For purposes of this determination [of Hennig's incentive compensation], "Net Equity Realized" means one hundred percent (100%) of the price received by Heartland Development Corporation in the Sale (in the event of a Stock Sale) or ninety five and five-tenths percent (95.5%) of the price paid by the Purchaser in the Sale (in the event of an Asset sale), less (i) Company debt, *investment in common*

*stock and additional paid in capital, any* other obligations of the Company which are not assumed by Purchaser as part of the Sale and (ii) fees and expenses incurred by the Company in connection with the Sale, including but not limited to, attorneys' fees, accountants' fees, environmental audit fees, and fees or commissions payable to investment bankers or brokers for services in connection with the Sale. The gross remuneration paid under this section shall, as determined by the Company, be subject to applicable withholding and payroll taxes.

(Emphasis added to highlight relevant change.) The next day, Hennig signed this version without noticing the changed definition. The change greatly disadvantaged Hennig, in that it reduced the base upon which his incentive payment would be calculated.

Crucial details of the events leading to the delivery of the final draft to Hennig on December 5 are disputed. According to Hennig, he and Ahearn discussed the November 30 draft on November 30 or December 1. Hennig claims that although the November 30 draft was presented as Ahearn's "final offer," Hennig asked for two relatively minor changes: that the company would reimburse Hennig's attorney fees, and that language requiring Hennig to make certain disclosures would be narrowed. Hennig also asked whether he would need to provide all the information requested under section 5, relating to the taxation of his compensation. According to Hennig, Ahearn agreed to make the two changes, and agreed to ask his attorney whether section 5 could be modified. At that point, Hennig believed that he and Ahearn had agreed on all issues and that they had a deal. Hennig also testified that the final version of the agreement was on his desk when he arrived at work on Tuesday, December 5.

160

According to Hennig, he and Ahearn did not speak about the agreement that day, and Hennig assumed that the final version of the agreement represented the terms of their oral agreement.

Ahearn, on the other hand, denies reaching an oral agreement with Hennig after the November 30 draft, and in fact, he denies even discussing the November 30 draft with Hennig. Ahearn acknowledges that he asked his attorney to modify the November 30 draft to provide that Hennig would be reimbursed for his attorney fees, and that the disclosure provisions would be narrowed. He contends, however, that he asked for these changes to be made because of discussions with Hennig before the November 30 draft and because of a response to the November 30 draft from Hennig's attorney. According to Ahearn, he considered Hennig to have rejected all prior proposals, and over the weekend of December 2–3, Ahearn himself revised the contract to make one last "take-it-or-leave-it" offer to Hennig. Ahearn testified that he personally delivered this final version of the agreement to Hennig; that he told Hennig to read it, that it was Ahearn's final offer, and that if Hennig did not sign it by 5:00 p.m. that day, the negotiations would be over.

From that point on, the respective versions of the essential facts again converge. Hennig ascertained that his requested changes had been made and faxed a copy of the document to his attorney, asking him to review it. Hennig's attorney also ascertained that the requested changes had been made and noted that certain language in paragraph 5 was superfluous. After a call to Ahearn's attorney, Hennig's attorney advised his client to strike out two sentences in paragraph 5 and to initial the change. Neither Hennig nor his attorney reviewed the entire document, however, and

neither noticed that the definition of "net equity realized" had been changed. Hennig signed the document, and Ahearn accepted the modification to paragraph 5. Hennig discovered the altered definition of net equity realized later in December, when he was informed that his incentive compensation payment would be $86,880, rather than the $303,979 that he was expecting.

Hennig sued Ahearn and Heartland Development, alleging intentional, negligent and strict responsibility misrepresentation, and seeking contract reformation. Ahearn moved for summary judgment on the grounds that (1) Ahearn had no duty to disclose the last-minute modification to the definition of "net equity realized," and that (2) Hennig's and his counsel's negligence in failing to discover the modification barred Hennig's recovery. Hennig moved for partial summary judgment, contending that, as a matter of law, Ahearn had a duty to disclose the modification. The trial court denied both motions, concluding that the disposition of Hennig's claims turned on disputed facts regarding "the intent of the parties as to the purpose and method" of the change to the definition of "net equity realized."

The case then went to trial. At the close of Hennig's case, Ahearn moved under § 805.14(3), STATS., for dismissal on the ground of insufficiency of evidence. The trial court granted the motion, concluding that there was no credible evidence to support either a misrepresentation claim or a contract reformation claim against Ahearn. The trial court concluded (1) that Ahearn had *no duty to disclose the modification to the definition of net equity realized* because the terms were fully disclosed on the face of the document, and (2) that Hennig's reliance on Ahearn's silence on that point was, as a matter of law, unjustified because Hennig and his attorney did not reread the entire document.

Hennig appeals the dismissal of his claims for insufficient evidence. Hennig also appeals certain evidentiary rulings that limited his attorney's testimony regarding his reasons for not reviewing the entire document, and that limited the testimony of Hennig's expert regarding customary practices among business persons and attorneys. Ahearn cross-appeals the denial of his motion for summary judgment and the denial of his motion for sanctions against Hennig and his counsel for maintaining a frivolous action.

## ANALYSIS

The central issue of the case—whether Hennig's misrepresentation and reformation claims have a sufficient legal and factual basis to survive dispositive defense motions—is before us in both the appeal and the cross-appeal. In the former, Hennig cites as error the trial court's dismissal of his claims at the close of his presentation of evidence at trial; in the latter, Ahearn challenges the court's denial of his motion to dismiss the claims on summary judgment. We conclude, however, that we need not discuss the cited rulings separately, because each involves our de novo review of the same legal questions.

Ahearn's motion for summary judgment and his motion to dismiss at the close of Hennig's case differ only in the parts of the record to which we must apply the relevant law. In reviewing Ahearn's motion for summary judgment, we look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" to determine if there is a genuine issue of material fact requiring trial. *See* § 802.08(2), STATS. In reviewing the motion to dismiss at the close of Hennig's case, we look to the evidence Hennig presented to the jury to determine

whether there is any credible evidence that would support a finding in his favor. *See* § 805.14(1), STATS.

Neither party contends that the materials submitted on summary judgment differ in any material way from the evidence Hennig adduced at trial. The dispute is purely a legal one: Ahearn argues that certain undisputed facts entitle him to judgment, regardless of whether we review the summary judgment submissions or the trial evidence. Hennig argues that his claims were entitled to survive at both junctures. For reasons of economy, therefore, we will not separately discuss the materials presented in support of and opposition to Ahearn's motion for summary judgment.

█

In reviewing a motion to dismiss at the close of plaintiff's case pursuant to § 805.14(3), STATS., we apply the same standard as the trial court. *See Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753, 761 (1995). The motion to dismiss must be denied unless, "considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." Section 805.14(1), STATS.

*I. Hennig's Misrepresentation Claims.*

Hennig's complaint alleges all three types of misrepresentation recognized in Wisconsin law: intentional, negligent and strict responsibility. *See Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 24, 288 N.W.2d 95, 99 (1980). In order to prevail on any misrepresentation claim, Hennig must establish both that Ahearn made a representation of fact that was untrue, and that Hennig justifiably relied on the misrepresentation. *See id.* at 25, 288 N.W.2d at 99. Hennig claims

that the trial court incorrectly concluded that he had failed to produce any credible evidence establishing either element.

### a. Duty to disclose.

█

Hennig contends that Ahearn made a false representation of fact by failing to disclose that he had altered the definition of "net equity realized" in the final version of the agreement. The failure to disclose a fact constitutes a misrepresentation if the defendant has a duty to disclose that fact. "If there is a duty to disclose a fact, failure to disclose that fact is treated in the law as equivalent to a representation of the nonexistence of the fact." *Id.* at 26, 288 N.W.2d at 100.

Ahearn contends that he was under no duty to point out his alteration of the definition of "net equity realized" in the final draft of the agreement. He argues that he fully disclosed the terms of the final version of the agreement because it is undisputed that those terms were unambiguously expressed on the face of the document, and he did nothing to prevent Hennig from discovering those terms. We disagree. Even though the terms of the agreement were unambiguously expressed in the document, and Hennig had the opportunity to review it, there are disputed facts which bear on whether Ahearn had a duty to point out his last-minute alteration of the compensation language.

The contract at issue was the product of a long negotiation during which alterations to significant terms were expressly disclosed and discussed among the parties and their counsel—save for the last-minute change to the definition of "net equity realized." The conduct of the parties and their attorneys may have

given rise to a duty on Ahearn's part to point out his proposed alterations in the compensation language of the agreement, depending on whose version of disputed facts the jury chose to believe.

The basic Wisconsin rule on the duty to disclose is expressed in *Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 288 N.W.2d 95 (1980). The specific issue in *Ollerman* was whether a seller of real estate has a duty to disclose to the buyer facts known to the seller regarding latent defects in the property. The court concluded that a seller has such a duty, and that the failure to disclose such facts was actionable as a misrepresentation. In reaching this conclusion, the *Ollerman* court endorsed the general principles in the RESTATEMENT (SECOND) OF TORTS § 551 (1977), and its accompanying comments, which it quoted extensively.

The *Ollerman* court relied particularly on RESTATEMENT (SECOND) OF TORTS § 551(2)(e) (1977), which provides that a party to a business transaction has a duty to disclose

> facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Ollerman*, 94 Wis. 2d at 36–37 n.18, 288 N.W.2d at 105 (quoting RESTATEMENT (SECOND) OF TORTS § 551(2)(e) (1977)). Thus, under the restatement approach adopted in *Ollerman*, the crucial element in determining whether a duty of disclosure exists is whether the mistaken party would reasonably expect disclosure. The *Ollerman* court explained, however, that it could not specify in advance all the circumstances that might

give rise to a reasonable expectation of disclosure. The court quoted the following guidance from comment *l*:

> There are situations in which the defendant not only knows that his bargaining adversary is acting under a mistake basic to the transaction, but also knows that the adversary, by reason of the relation between them, the customs of the trade or other objective circumstances, is reasonably relying upon a disclosure of the unrevealed fact if it exists. In this type of case good faith and fair dealing may require a disclosure.
>
> It is extremely difficult to be specific as to the factors that give rise to this known, and reasonable, expectation of disclosure. In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense .of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware. . . .

*Id*. at 37–38, 288 N.W.2d at 105 (quoting RESTATEMENT (SECOND) OF TORTS § 551 cmt. *l* (1977)).

Whether one has a duty to disclose a fact in a particular set of circumstances is essentially a policy decision, and it is, therefore, properly decided as a question of law. *See id*. at 27, 288 N.W.2d at 100. However, the facts surrounding an act of nondisclosure must be fully determined before a court can properly conclude whether a duty of disclosure exists:

> If there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the

particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty.

RESTATEMENT (SECOND) OF TORTS § 551 cmt. m (1977); *see also Ollerman*, 94 Wis. 2d at 52, 288 N.W.2d at 112.

We conclude that in this case, Hennig presented credible evidence from which a jury, "under appropriate instructions as to the existence of the duty," could find that Ahearn had a duty to point out his last-minute change to the document, and that he breached that duty. *See id.* Through the presentation of the November 30 draft, all changes proposed by either party were highlighted in successive drafts, and the evolving terms of the agreement were expressly discussed among the parties and their attorneys. The definition of "net equity realized" had remained essentially unchanged throughout these drafts. A jury could find that Hennig could reasonably expect Ahearn to disclose a significant, last-minute revision to the definition. And, if it believed Hennig's testimony regarding the meeting with Ahearn after the presentation of the November 30 draft, the jury could conclude that Ahearn had engaged in "a form of swindling, in which [Hennig was] led by appearances into a bargain that [was] a trap." RESTATEMENT (SECOND) OF TORTS § 551 cmt. *l* (1977). That is, a jury could find that Ahearn made the last-minute change in the compensation arrangement hoping that Hennig would not notice it, and that Hennig would thereby sign an agreement that Hennig would not have knowingly accepted.

168

### b. Justifiable reliance.

We turn next to a consideration of whether Hennig presented sufficient evidence to allow a jury to conclude that he justifiably relied on Ahearn's failure to point out that the final contract contained a new phrase that greatly reduced the amount of compensation under the agreement. A showing of justifiable reliance is necessary in order for Hennig to prevail on his claim for intentional misrepresentation. *See Williams v. Rank & Son Buick, Inc.,* 44 Wis. 2d 239, 245–46, 170 N.W.2d 807, 810–11 (1969).

Ahearn contends that even if his failure to disclose the alteration to the definition of "net equity realized" constituted a misrepresentation, Hennig's reliance on that misrepresentation was unreasonable, thus precluding Hennig from recovering damages in tort. Ahearn asserts that "a failure to read proposed contract terms is presumptively negligent and unreasonable." Thus, according to Ahearn, Hennig's reliance was unjustified as a matter of law. Ahearn relies chiefly on this court's decision in *Ritchie v. Clappier,* 109 Wis. 2d 399, 326 N.W.2d 131 (Ct. App. 1982).[2]

---

[2] In *Ritchie v. Clappier,* 109 Wis. 2d 399, 326 N.W.2d 131 (Ct. App. 1982), we concluded that a seller of real estate was bound by the terms of a deed that he signed, even though the buyers had misrepresented the contents of the deed by telling the buyer that it was simply an agreement to return a security deposit. We concluded, on the basis of undisputed facts, that the falsity of the buyers' misrepresentation should have been readily apparent to ordinary observation. The deed was clearly labeled as a standard form quit-claim deed and the seller was an experienced, licensed real estate agent who had ten or fifteen minutes to read the deed.

The question of whether claimed reliance is justifiable may be decided as a matter of law, but only if the pertinent facts are undisputed. *See Williams,* 44 Wis. 2d at 246, 170 N.W.2d at 811. Ahearn contends that the following undisputed facts establish that Hennig's reliance was unreasonable as a matter of law: Hennig was an experienced businessman; the terms of the final document were unambiguous; Hennig had thirty hours to review the document; Hennig was represented by competent counsel. Ahearn's argument, in essence, is that because he gave Hennig ample time to read the document, Hennig's misrepresentation claim must fail. We disagree for two reasons: Ahearn reads *Ritchie* too broadly; and in the present case, whether Hennig's reliance was unreasonable depends on disputed facts.

The general rule in Wisconsin, as elsewhere, is that the recipient of a fraudulent misrepresentation is justified in relying on it, unless the falsity is actually known or is obvious to ordinary observation. *See id.* at 245–47, 170 N.W.2d at 810–11; *see also Ollerman,* 94 Wis. 2d at 43–45 n.26, 288 N.W.2d at 108 (citing RESTATEMENT (SECOND) OF TORTS §§ 540 and 541). And, whether falsity is obvious is usually a question of fact. *See Williams,* 44 Wis. 2d at 246, 170 N.W.2d at 811.

Our discussion in *Ritchie* conforms to these general rules, notwithstanding our citation of a 1903 case for the proposition that "[g]enerally, a person is negligent if he or she signs a contract without ascertaining its contents and is not prevented from doing so, even if induced to sign by fraudulent misrepresentations." *Ritchie,* 109 Wis. 2d at 404–05, 326 N.W.2d at 134 (citing *Bostwick v. Mutual Life Ins. Co.,* 116 Wis. 392, 403, 89 N.W. 538, 541 (1903)). The supreme court has

170

limited *Ritchie* to its specific facts, noting that "*Ritchie* does not establish an absolute rule that a person who fails to read a contract is barred from making a claim of misrepresentation." *Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 734, 456 N.W.2d 585, 589 (1990). As the supreme court made clear in *Bank of Sun Prairie*, "all the circumstances" surrounding the transaction are relevant to the question of whether the misled party's reliance was reasonable. *See id.*

We conclude that the obviousness of Ahearn's last-minute alteration is a question of fact for the jury.[3] A jury could conclude from the evidence Hennig presented that Ahearn's modification of the amount of Hennig's compensation in the final contract was not obvious. First, Ahearn accomplished the change, not by altering the percentage figures in the compensation formula, but less obviously, by altering the definition of the base upon which Hennig's compensation would be calculated. Even though the entire agreement was only five pages long, Ahearn's change was a relatively small detail, consisting of nine words inserted in the middle of a paragraph-long, multi-part definition. Moreover, unlike the quit-claim deed in *Ritchie*, the agreement

---

[3] Under WIS J I—CIVIL 2401, jurors are instructed as follows:

> If you find, however, that (plaintiff) or the person to whom the representations were made knew them to be untrue, then there can be no justifiable reliance as nobody has the right to rely upon representations that he or she knew were untrue.
>
> Nor can there be justifiable reliance if (plaintiff) relied on representations which (plaintiff) should have recognized at once as preposterous or which are shown by facts within (his) (her) easy observation and (his) (her) capacity to understand to be so patently and obviously untrue that (plaintiff) must have closed (his) (her) eyes to avoid discovery of the truth.

here was the product of a long negotiation in which multiple drafts were exchanged, and changes to previous proposals were either highlighted or discussed by the parties or their attorneys. The trial produced conflicting testimony regarding the interactions of the parties just prior to Ahearn's alteration of the document. Under these circumstances, we conclude that the question of whether Hennig's reliance on Ahearn's silence was reasonable is properly one for the jury.

Ahearn would have us conclude, as the trial court did, that "[a]s a matter of law, Mr. Hennig is guilty of negligent reliance because it is undisputed that he failed, without excuse or justification, to read all terms of [the] document he then knew to be a proposed contract before signing the document." We acknowledge that courts should "refuse to act for the relief of one . . . who blindly acts," and that a plaintiff "may not close his eyes to what is obviously discoverable by him." *Williams*, 44 Wis. 2d at 245, 170 N.W.2d at 810. However, we also conclude that the inflexible rule Ahearn urges us to apply to the present facts would greatly add to the time and expense of consummating commercial transactions. We are thus unwilling to hold, as a matter of law, that notwithstanding a pattern or practice of the parties or their counsel of highlighting and discussing all modifications in previous drafts, a party must read each and every word of successive drafts of a complex commercial document in order to ensure that another party has not surreptitiously inserted a significant last-minute change.

### c. The three misrepresentation claims.

We note finally that neither of the parties has separately argued or analyzed whether Hennig's evidence was sufficient to sustain each of the three misrepresentation claims he pled. A misrepresentation of fact and justifiable reliance thereon are elements common to all three types of misrepresentation. *See Grube v. Daun,* 173 Wis. 2d 30, 53–54, 496 N.W.2d 106, 114 (Ct. App. 1992). Although we have concluded that Hennig produced credible evidence to establish these elements, we do not conclude that all three causes of action for misrepresentation should necessarily get to the jury. The evidence is undisputed that Ahearn's alteration of the definition of "net equity realized" was intentional. We conclude that Hennig has presented sufficient evidence from which a jury could infer that Ahearn's nondisclosure of the change was knowing, and done with the intent to deceive Hennig, for the purpose of inducing him to enter into a contract that he would not knowingly have signed. Thus, Hennig has established a prima facie claim for intentional misrepresentation. *See id.* at 54–55, 496 N.W.2d at 114.

We express no opinion, however, regarding whether Hennig's claims for strict responsibility and negligent misrepresentation are equally viable on the present record. These issues have not been raised or briefed. *See Waushara County v. Graf,* 166 Wis. 2d 442, 451, 480 N.W.2d 16, 19 (1992) (noting that appellate courts "need not and ordinarily will not" decide issues not specifically raised on appeal); *State v. Pettit,* 171 Wis. 2d 627, 647, 492 N.W.2d 633, 642 (Ct. App. 1992) (holding that we may decline to review an inadequately briefed issue). The trial court on remand, after hearing

the evidence presented by both parties, should determine whether the evidence requires the jury to be instructed on only one, two or all three types of misrepresentation.

## II.   Hennig's Reformation Claim.

In addition to alleging claims for misrepresentation, Hennig also seeks reformation of the compensation contract. Reformation of a written instrument is appropriate when the instrument fails to express the intent of the parties, either because of the mutual mistake of the parties, or because of the mistake of one party coupled with fraud or inequitable conduct of the other. *See City of Milwaukee v. Milwaukee Civic Devs., Inc.*, 71 Wis. 2d 647, 653, 239 N.W.2d 44, 48 (1976). Ahearn personally altered the terms of the compensation agreement and was therefore fully aware of the terms expressed in the final version he presented to Hennig. Hennig does not challenge the trial court's conclusion that there was no credible evidence of mutual mistake.

Hennig contends, however, that the trial court erred in concluding that there was "no credible evidence of any unilateral mistake on the part of Mr. Hennig and of fraud on the part of Mr. Ahearn. . . ." We agree that this was error. Hennig's unilateral mistake is undisputed; and, as we have discussed, Hennig presented credible evidence from which a jury might infer that Ahearn engaged in fraud or inequitable conduct in inducing Hennig to sign the agreement.

The "fraud or inequitable conduct" necessary to justify the reformation of a contract need not, however, involve active intentional deceit. *See First Nat'l Bank*

174

*of Kenosha v. Scalzo*, 70 Wis. 2d 691, 701, 235 N.W.2d 472, 477 (1975) (holding that fraud as a basis for contract reformation can be based on either willful or innocent misrepresentations). It is sufficient for contract reformation that one party is mistaken as to a material term of a writing and that the other knows of this mistake and fails to point it out. *See City of Milwaukee*, 71 Wis. 2d at 653, 239 N.W.2d at 48 (citing RESTATEMENT OF CONTRACTS § 505 (1932)).

The rule in section 505 of the first RESTATEMENT OF CONTRACTS has been incorporated into RESTATEMENT (SECOND) OF CONTRACTS § 166 (1981), which provides, in relevant part:

> If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement, the court at the request of the recipient may reform the writing to express the terms of the agreement as asserted,
>
> (a) if the recipient was justified in relying on the misrepresentation . . . .

One of the illustrations to new § 166, in presenting a situation that is quite similar to Hennig's version of the present facts, demonstrates that the rule of old § 505 is preserved:

> A, seeking to induce B to make a contract to sell a tract of land to A for $100,000, makes a written offer to B. A knows that B mistakenly thinks that the offer contains a provision under which A assumes an existing mortgage and that it does not contain such a provision, but does not disclose this to B for fear that B will not accept. B is induced by A's non-disclosure to sign the writing, which is an integrated agreement. A's non-disclosure is equivalent

> to an assertion that the writing contains such a provision ... and amounts to a fraudulent misrepresentation. At the request of B, the court will reform the writing to add the provision for assumption.

RESTATEMENT (SECOND) OF CONTRACTS § 166 cmt. a, illus. 4 (1981).

We thus conclude that Hennig established a basis for his reformation claim by presenting evidence of his unilateral mistake and Ahearn's possibly fraudulent or inequitable conduct. We also conclude that Hennig's reformation claim is not barred, as a matter of law, by his potential negligence in failing to discover the alteration to the definition of "net equity realized," just as his misrepresentation claim was not automatically barred on that basis. As with his misrepresentation claim, however, Hennig must establish that his reliance on Ahearn's implicit misrepresentation was "justified" in order to prevail on his contract theory. *See* RESTATEMENT (SECOND) OF CONTRACTS § 166. The comment accompanying illustration 4 to RESTATEMENT (SECOND) OF CONTRACTS § 166 provides that "[r]eformation is not precluded by the mere fact that the party who seeks it failed to exercise reasonable care in reading the writing, but his reliance on the misrepresentation must be justified and the right to reformation is therefore subject to the rule on fault stated in § 172."

RESTATEMENT (SECOND) OF CONTRACTS § 172, in turn, provides:

> A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

.And, comment b to § 172 explains further that:

> If the recipient knows that the assertion is false or should have discovered its falsity by making a cursory examination, his reliance is clearly not justified and he is not entitled to relief. *See* RESTATEMENT, SECOND, TORTS § 541. He is expected to use his senses and not rely blindly on the maker's assertion. On the other hand, he is not barred by the mere failure to investigate the truth of a misrepresentation, even where it might be reasonable to do so. *See* RESTATEMENT, SECOND, TORTS § 540.

Thus, in order to prevail on his reformation claim, Hennig must show that: (1) Hennig mistakenly believed that the final version of the document represented terms to which he had agreed, and he was thus induced to sign it; (2) Ahearn knew that Hennig was mistaken about the contents of the final version of the document, but did nothing to correct Hennig's error; and (3) the alteration of the definition of "net equity realized" was not apparent on a cursory examination. All the facts necessary to Hennig's reformation claim must be shown by clear and convincing evidence. *See First Nat'l Bank of Kenosha*, 70 Wis. 2d at 701–02, 235 N.W.2d at 477; *see also* ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 615 (1960).

We conclude that Hennig presented credible evidence to support the elements of his reformation claim. The trial testimony establishes that Hennig was mistaken about the contents of the final version of the document and that Ahearn did nothing to correct Hennig's mistake. Depending on how jurors assess Hennig's and Ahearn's testimony, they could also conclude that Ahearn knew of Hennig's mistake. Ahearn

made the change to the document over the weekend, and he acknowledged that he did not point it out to Hennig when presenting the final agreement to him. It is also undisputed that no change that would affect the computation of Hennig's compensation was ever discussed by the parties or their attorneys, save the addition of language to clarify how it would be computed in the event of an asset sale versus a sale of stock. A jury could also conclude that the alteration of the definition of "net equity realized" was not apparent on a cursory examination of the final document. Hennig need not prove that he and Ahearn had reached an agreement prior to the presentation of the final draft, but if the jury concludes an agreement had been reached as Hennig maintains, it could well find Hennig's subsequent failure to carefully reread the entire document to be reasonable.

### III.   Evidentiary Rulings.

Hennig contends that the trial court erred in excluding his attorney's testimony as to why he did not reread the entire final draft of the agreement, and in excluding Hennig's expert's testimony regarding the customs and practices of business executives. The decision to admit or exclude evidence lies within the discretion of the trial court. *See State v. Alsteen*, 108 Wis. 2d 723, 727, 324 N.W.2d 426, 428 (1982). We will not set aside a discretionary ruling of the trial court if it appears from the record that the court applied the proper legal standards to the facts before it, and through a process of reasoning, reached a result which a reasonable judge could reach. *See Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175, 184 (1982). However, an appellate court will not hesitate to reverse

a discretionary determination when a lower court's exercise of discretion is based on an erroneous view of the law. *See State v. McConnohie*, 113 Wis. 2d 362, 371, 334 N.W.2d 903, 908 (1983).

The trial court did not allow Hennig's attorney to testify about the status of the negotiations between Hennig and Ahearn as of the weekend of December 2–3, nor did the court allow him to explain why he did not review all of the terms of the final contract draft which Hennig faxed to him on December 5th. The trial court apparently concluded that this would constitute expert legal opinion, and that Hennig's attorney could not testify as an expert because he had not been disclosed as an expert by Hennig. Hennig contends that this was error, because his attorney's testimony as to why he did not read the entire final version of the agreement would have presented facts relating to the transaction, not opinion testimony. Hennig further contends that even if the testimony were opinion testimony, it was admissible lay opinion under § 907.01, STATS.

We agree that the trial court erred in excluding this testimony. Under § 907.01, STATS., opinion testimony by lay witnesses is admissible if it is "rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." We conclude that much of the excluded testimony would have constituted transactional facts, but even those portions which might be characterized as expressing opinions involve lay, not expert, opinions. The attorney's testimony regarding the status of the negotiations as of December 5, and his reasons for reviewing only selected portions of the final contract draft, were not

offered as expert legal opinion, but as an explanation of why he and Hennig did what they did at that stage of the negotiations. The attorney's understanding of those negotiations, particularly as to whether an agreement had been reached, make his and Hennig's decisions not to reread the entire contract either more or less reasonable.

To put it another way, Hennig's attorney was an actor in the negotiation and consummation of the contract at issue. What he perceived and did at relevant points in the process, as well as why he did (or did not do) certain things, are matters "rationally based on the perceptions of the witness," and they would likely be "helpful to a clear understanding of the witness's testimony" and to "the determination of a fact in issue." *See* § 907.01, STATS. By contrast, because he was not presented to the court as an expert, Hennig's attorney should not be allowed to give opinions as to what a reasonably competent attorney would have or should have done under the circumstances. Hennig did not attempt to elicit that type of testimony from this witness. It may be, as Ahearn argued to the trial court, that Hennig's attorney has a significant interest in the outcome of the proceeding and that his testimony would be self-serving. These considerations, however, are present with respect to many witnesses, and they go to the weight and credibility of the proffered testimony, not its admissibility.

Hennig did attempt to elicit expert opinions from another attorney, whom he had named and called as an expert. Hennig contends that the trial court erred in preventing his expert from testifying as to the customs and practices of business executives regarding contract negotiations and revisions. Hennig contends that the trial court so ruled because the court simply concluded

180

that business executives have no such customs. Hennig's explanation of the court's reasoning is not entirely accurate. The trial court concluded that the expert was not qualified to testify as to the customs of business executives. Whether a witness is qualified to give particular opinions as an expert is also a discretionary determination for the trial court, which we will affirm if the court applied the proper legal standards to the facts before it, and through a process of reasoning, reached a result which a reasonable judge could reach. *See Wester v. Bruggink*, 190 Wis. 2d 308, 317, 527 N.W.2d 373, 377 (Ct. App. 1994); § 907.02, STATS.

In this case, the trial court permitted the expert to testify on the customs of the legal community. But, because he spent less than five percent of his time working in the capacity of a business executive himself, the trial court did not allow the attorney to testify as an expert on the customs of business executives. It is not necessary, however, that an expert have personally performed the activities at issue in order for him or her to give an opinion thereon, provided that the expert is "qualified as an expert by knowledge, skill, experience, training, or education" regarding the matters at issue. *See* § 907.02, STATS. For example, we concluded in *Tanner v. Shoupe*, 228 Wis. 2d 357, 596 N.W.2d 805 (Ct. App. 1999), that an automobile mechanic should be permitted to testify regarding the adequacy of warnings on automobile batteries. Even though the mechanic had not been involved in designing or writing warnings for automobile batteries, we deemed it sufficient that he had "disassembled thousands of batteries" and understood "the chemical and electrical processes" and "what causes batteries to explode." *Id.* at 371, 596 N.W.2d at 813–14.

Hennig's expert testified that for many years, his practice had concentrated "in the business area"; that he had drafted numerous business contracts, including employment and compensation agreements; and that he was familiar with "the customs and practices of attorneys and business executives in negotiating and drafting agreements[.]" The expert should not have been precluded from testifying regarding the practices of business executives relevant to the present dispute merely because the expert had not himself been a business executive.

## IV. Punitive Damages.

Hennig contends that the trial court erred in not submitting the question of punitive damages to the jury. As we have discussed, however, the trial court allowed *none* of Hennig's claims to get to the jury, and it is thus not surprising that the appealed order contains no discussion of the punitive damages issue. The court did say in its oral ruling that it found no basis for a punitive damages claim on the record before it—"There is nothing that was done in the course of this dealing that was outrageous, that was willful, wanton, reckless disregard of the plaintiff's right." Since the trial court concluded that Hennig had not presented a valid claim for compensatory damages, its conclusion that punitive damages were unavailable is understandable.

Before a question on punitive damages can be put to a jury, a trial court must determine whether, as a matter of law, the evidence will support a punitive damages award. *See Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 614, 563 N.W.2d 154, 158 (1997). In order for a plaintiff to obtain punitive damages, there

must be clear and convincing evidence that a defendant's conduct was "outrageous," that is, "willful or wanton, in a reckless disregard of rights or interests." *Brown v. Maxey*, 124 Wis. 2d 426, 433, 369 N.W.2d 677, 681 (1985). If this standard is met, the trial court should submit the punitive damages question to the jury; otherwise, it should not. While we are to review the question de novo, *see Steenberg Homes*, 209 Wis. 2d at 614, 563 N.W.2d at 158, we conclude that, in this case, it would be premature for us to do so.

We are remanding for trial, which is to be conducted consistent with our discussion in this opinion. Presumably, this means that the trial will not end at the close of plaintiff's case, and that certain additional testimony will be permitted into evidence. It will be up to the trial court to consider the issue of whether a punitive damages question should be put to the jury after it has heard all of the evidence, both Hennig's and Ahearn's, and the arguments of their counsel on the matter. We thus deem the question premature. Our reversal of the appealed order should not be interpreted as communicating any views regarding whether a punitive damages question should be put to the jury on remand.

### V. Ahearn's Motion for Summary Judgment.

As we have discussed, we will not separately discuss Ahearn's cross-appeal of the trial court's denial of his motion for summary judgment. For the same reasons that we reverse the dismissal of Hennig's claims at the close of his evidence, we affirm the trial court's order denying dismissal of these claims on summary judgment. Since Ahearn has not claimed that the record on summary judgment differed materially from the evidence at trial, we can only conclude that the trial

court's view of the law governing Hennig's claims evolved between its two rulings. The court's conclusion that disputed issues of material fact precluded judgment as a matter of law in Ahearn's favor was correct.

*VI. Ahearn's Claim for Sanctions for Maintaining a Frivolous Action.*

Ahearn also cross-appeals the denial of his motion for sanctions against Hennig for maintaining a frivolous action pursuant to §§ 802.05 and 814.025, STATS. Ahearn contends that Hennig's claims lacked a reasonable basis in law and fact. We disagree with this contention, as we have discussed at length above. Accordingly, the trial court did not err in denying Ahearn's request for sanctions.

## CONCLUSION

For the reasons discussed above, we reverse the order dismissing Hennig's claims and remand the case for trial. We affirm, however, the denial of Ahearn's motion for summary judgment and the order denying sanctions under §§ 802.05 and 814.025, STATS.

*By the Court.*—Appealed order reversed and cause remanded with directions; cross-appealed orders affirmed.