In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3297

PRODUCTION SPECIALTIES GROUP, INC.,
a Wisconsin Corporation,

*Plaintiff-Appellee*,

*v.*

MINSOR SYSTEMS, INC., a Michigan Corporation
and MINSOR POWERTRAIN SYSTEMS LLC,
a Michigan limited liability company,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 758—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED MARCH 26, 2007—DECIDED JANUARY 17, 2008

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Minsor Systems and Minsor Powertrain Systems ("Minsor") entered into a contract with Production Specialties Group ("PSG") in which PSG agreed to make Minsor a machine needed for manufacturing an automotive part. Minsor cancelled the contract after PSG was unable to deliver an acceptable machine, and PSG brought this diversity action for breach of contract and fraud in the inducement. A jury found for PSG on both claims and awarded punitive damages on the

fraud claim. Minsor moved for judgment notwithstanding the verdict and for a new trial on the fraud claim, arguing that PSG's claims were barred by the economic loss doctrine; that the court issued erroneous jury instructions; and that the evidence was insufficient to support either a verdict for the plaintiff on the fraud claim or punitive damages. The district court denied both motions, and Minsor appeals from that ruling. We find that Minsor failed to preserve its economic loss argument and that an erroneous burden of proof instruction did not constitute plain error. In addition, we conclude that the district court did not err in giving a punitive damages instruction because there was sufficient evidence to show that Minsor intentionally disregarded PSG's rights. For these reasons, we affirm.

## I. BACKGROUND

Minsor supplies automotive parts. In March 2004, Minsor solicited bids on a contract to manufacture a machine that could turn a steel forging into a "TB knuckle," an automotive part that is attached to a truck axle. Minsor needed to submit a prototype of the TB knuckle to its customer by April 15, 2004. Minsor selected PSG to produce the machine as it was the only company that could commit to delivering the prototype TB knuckles on time. In early April, PSG received steel forgings so it could begin making the prototypes. At this point, PSG began having problems. Before it submitted its bid, Minsor's vice-president of engineering, Brett Stevenson, told PSG that it would need to make a machine that could remove 2.0 millimeters to 2.5 millimeters of excess material per side from the steel forging. But when PSG received the steel forgings to make the prototype, it discovered that they actually contained significantly more than 2.5 millimeters of excess material. This

meant that the machine PSG was making could not transform the forgings into TB knuckles as quickly as its original bid had promised. PSG informed Stevenson of this problem, and according to PSG's vice-president of sales and engineering, Rick Glowacki, Stevenson assured PSG that the steel forgings it had received were just preliminary prototypes and PSG would be able to make changes to the forgings that would be used during the actual production process. After receiving this assurance, PSG signed the contract on April 13, 2004. The contract, consistent with PSG's original bid, required PSG to produce a machine that could manufacture 22 parts per hour. A couple weeks later, PSG learned that, contrary to Stevenson's assurance, the forgings could not be changed to eliminate the excess material. Realizing that this meant it would have difficulty providing Minsor with a machine that could manufacture the promised 22 parts per hour, PSG offered to cancel the contract and return Minsor's initial payment. Minsor declined and told PSG to keep working on the machine to see how close it could come to meeting the 22 parts per hour goal. By June, PSG had still not been able to produce an acceptable machine, and Minsor had rejected PSG's proposals to address the problem. Minsor then cancelled the contract because of PSG's failure to perform.

PSG brought suit for breach of contract and fraud in the inducement. It claimed that Minsor fraudulently induced it to enter into the contract when Stevenson told PSG's Glowacki that the steel forgings with the excess stock were just prototypes that could be changed later. PSG's principal evidence that this statement was false was the testimony of Minsor's vice-president of quality assurance, Patrick Smith. Smith testified that he knew early in the process that the production forgings would likely be the same as the prototypes and could probably not be changed.

At the trial, Minsor unsuccessfully moved for judgment as a matter of law at the close of PSG's case. It did not renew this motion at the close of all the evidence, and the jury returned a verdict in favor of PSG. Minsor then retained new counsel who moved for judgment notwithstanding the verdict and for a new trial. In its motions, Minsor argued that: (1) PSG should have written into the contract Stevenson's assurance that the forgings could be changed and, therefore, was barred from asserting a fraud claim under the economic-loss doctrine; (2) the district court erroneously instructed the jury that the standard of proof on the fraud claim was by a preponderance of the evidence instead of clear and convincing evidence; (3) insufficient evidence supported the jury's verdict on the fraud claim; and (4) there was insufficient evidence to justify the giving of a punitive damages instruction. Minsor did not challenge the jury's verdict on the breach of contract claim.

PSG argued that Minsor had waived the economic-loss doctrine defense because it did not raise this defense before trial in a motion for summary judgment or a motion to dismiss. It contended that Minsor was only entitled to plain error review of the erroneous jury instruction because it did not object at trial and that the instruction did not violate Minsor's substantial rights because the court also instructed the jury that to award punitive damages it had to find by clear and convincing evidence that Minsor intentionally disregarded PSG's rights. Finally, PSG pointed to Smith's testimony as evidence that was sufficient to support the jury's verdict on the fraud claim and support the giving of a punitive damages instruction. The district court accepted all of these arguments and denied Minsor's motions.

## II. ANALYSIS

As an initial matter, we note that at the time of the trial in this case, the Federal Rules of Civil Procedure required a party moving for judgment notwithstanding the verdict ("J.N.O.V.") to first move for judgment as a matter of law at the close of all the evidence. Fed. R. Civ. P. 50(b) (2005);[1] *see also Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 775 (7th Cir. 2002). As PSG points out, Minsor did not do this, and we have strictly enforced this rule in the past, even in cases where a defendant moved for judgment as a matter of law at the close of the plaintiff's case. *See, e.g., Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1364 (7th Cir. 1996); *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1139-40 (7th Cir. 1994). Therefore, we must affirm the denial of Minsor's motion for J.N.O.V.

These procedural rules do not apply to motions for a new trial however. *See* Fed. R. Civ. P. 59. Therefore, we can consider all of Minsor's arguments in support of that motion. On appeal, Minsor renews the arguments it made in the district court.

### A.  Economic Loss Doctrine

PSG argues that Minsor waived its argument that the economic loss doctrine bars PSG from recovering on its fraud claim by not raising it sooner, and we agree. A motion for a new trial is not the appropriate place to raise for the first time arguments that could have been brought earlier in the proceedings. *Naeem v. McKesson*

---

[1] Effective December 1, 2006, Rule 50 was amended "to permit renewal of any Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence." Fed. R. Civ. P. 50 advisory committee's note.

*Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006); *Anderson v. Flexel, Inc.*, 47 F.3d 243, 247 (7th Cir. 1995). Minsor's economic-loss argument is a legal question that could have been easily resolved at the summary judgment stage or even as a motion to dismiss for failure to state a claim. Minsor brought neither of these motions and did not even raise this defense in the course of the trial itself.

## B. Sufficiency of the Evidence & Burden of Proof Instruction

Minsor next argues that the district court erroneously denied its motion for a new trial on the grounds that the jury was given the wrong burden of proof on the fraud claim and that PSG did not present sufficient evidence to support the jury's verdict on that claim. Under Wisconsin law, which the parties agree applies, PSG had to prove the following elements to support its fraud claim: (1) Minsor made a factual misrepresentation before contract formation, (2) Minsor knew the representation was untrue or made it recklessly without caring whether it was true, (3) Minsor made the representation intending to deceive PSG and induce PSG to act on it, and (4) PSG believed the representation to be true and justifiably relied on it. *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 211 (Wis. 2005); *Malzewski v. Rapkin*, 723 N.W.2d 156, 162 (Wis. Ct. App. 2006). Each element must be proven by "clear, satisfactory, and convincing evidence." *Digicorp, Inc. v. Ameritech Corp.,* 662 N.W.2d 652, 663 (Wis. 2003) (internal quotation marks omitted).

The jury, however, was instructed that in order to find that Minsor committed fraud, PSG had the burden of establishing each element by a preponderance of the evidence. PSG submitted the wrong instruction to the district court, and the error went unchecked. Minsor

never supplied its own correct instruction and waited until its motion for a new trial to challenge the court's instruction.

Fed. R. Civ. P. 51(d)(2) permits a court to consider a plain error in the jury instructions affecting substantial rights that has not been preserved as required by Fed. R. Civ. P. 51(d)(1). As in the criminal context, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights," and (4) the court must be convinced that the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *See Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (internal quotation marks omitted); *Higbee v. Sentry Ins. Co.*, 440 F.3d 408, 409 (7th Cir. 2006).

Although the district court clearly erred by giving the wrong instruction, we find that Minsor has not met its "burden of establishing that the error affected substantial rights, i.e., that the outcome probably would have been different without the error." *United States v. Pree*, 408 F.3d 855, 869 (7th Cir. 2005) (internal quotation marks omitted). We conclude that the jury probably would have found that Minsor committed fraud, even if it had been instructed under the proper, higher burden of proof of "clear, satisfactory, and convincing evidence." In challenging this point, Minsor focuses principally on the last element of the fraud claim: that PSG believed the representation to be true and justifiably relied on it. Minsor points out that before PSG signed the contract, it had already begun working with the prototype forgings and knew that they contained more than 2.5 millimeters of excess material. Therefore, Minsor contends, PSG could not have justifiably relied on Minsor's statement that the machines it was making would only have to remove 2.0 millimeters to 2.5 millimeters of excess material from the forgings.

This argument ignores the evidence that Minsor made further false representations about the excess material after PSG informed Minsor of the difficulties it was having with the prototype forgings. Rick Glowacki (of PSG) testified that Brett Stevenson (of Minsor) told him that the prototype forgings were just preliminary and could be changed later. Based on this statement, Glowacki was reassured that the original representations about the excess material to be removed from the forging would be honored even though the prototype forgings turned out to have more excess material than expected. PSG presented enough evidence for the jury to conclude that Stevenson's statement was knowingly false. Specifically, Patrick Smith (of Minsor) testified that he knew the prototype forgings probably could not be changed early in the process, around the same time that Stevenson told Glowacki the prototype forgings could be changed. Smith also testified that he had discussions with Stevenson about problems with the prototypes. The jury could easily infer from this testimony that at the time Stevenson told Glowacki that changes could be made to the prototypes, Stevenson, like Smith, knew that changes probably would not be possible. Indeed, that the jury awarded PSG punitive damages suggests that it found by "clear, satisfactory, and convincing evidence"[2] that Stevenson had made a knowing misrepresentation. *Cf. United States v. Verrusio*, 803 F.2d 885, 892 (7th Cir. 1986) (finding plain error when an incorrect burden of persuasion was assigned to a criminal defendant because the evidence on the relevant issue was roughly in equipoise).

In its reply brief, Minsor argues that PSG was not justified in relying on Stevenson's statement because all

---

[2] The jury was correctly instructed that this heightened burden applied for PSG's punitive damages claim.

he said was that the forgings could be changed, not that they would be changed, and because PSG made no attempt to write this assurance into the contract. A party is not justified in relying on a representation that it should recognize as obviously false. *Hennig v. Ahearn*, 601 N.W.2d 14, 24 (Wis. Ct. App. 1999). But Minsor's representation that changes could be made to the forgings was not obviously false. As we have pointed out, there was enough evidence for the jury to conclude that Minsor knew there was little possibility of changing the forgings when it told PSG otherwise. Furthermore, Glowacki testified that PSG relied on Minsor's statement that changes would be possible when it agreed to go through with the contract in spite of the problems it was having with the prototypes. The jury could have questioned whether PSG really did rely on Stevenson's statement about making changes to the forgings given the vague and uncertain nature of that statement. But the jury's verdict suggests that it believed Glowacki's testimony that PSG did rely on Stevenson's statement, and we do not ordinarily overturn a jury's credibility finding. *Pearson v. Wellborn*, 471 F.3d 732, 738 (7th Cir. 2006).

At any rate, Minsor has failed to show that the particular error here is of the kind that if left uncorrected would result in a miscarriage of justice. As explained above, Minsor probably would have lost on PSG's fraud claim even if the jury had been properly instructed, so Minsor is hard-pressed in claiming that this error tainted the district court proceedings. And here, the civil litigant claiming that it alone has been harmed by an erroneous instruction bears significant responsibility for that error in the first place. *Cf. Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 36 (1st Cir. 2006) (vacating damages award stemming from an erroneous jury instruction in an Individuals with Disabilities Education Act case in part because the award would impact non-party school children by

diverting scarce educational resources). Minsor had a chance to submit proposed jury instructions to the court. *See* Fed. R. Civ. P. 51(a). It chose not to do so, instead relying on the instructions submitted by PSG. Minsor has not provided any reason why the court should cure this "self-inflicted wound." *See Rivera Castillo v. Autokirey, Inc.,* 379 F.3d 4, 10 (1st Cir. 2004); *see id.* at 12 (finding no miscarriage of justice when a party failed to propose jury instructions or object to the court's instructions). Indeed, Minsor's failings run deeper: when the parties were hashing out the final instructions and the court sought to clarify that PSG's punitive damages claim required a higher burden of proof than the preponderance standard, Minsor's counsel simply agreed, never alerting the court that a higher burden should also apply to PSG's fraud claim. In sum, because Minsor has not given us a good reason to excuse its many mistakes, we conclude that the erroneous instruction here did not "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings."

## C. Punitive Damages

Finally, Minsor argues that the district court erred by instructing the jury on punitive damages because there was not sufficient evidence to show that Minsor acted maliciously, vindictively, or with an improper motive. But PSG did not have to show that Minsor acted maliciously or vindictively; it had to show only that Minsor intentionally disregarded PSG's rights. *See* Wis. Stat. § 895.043(3) (formerly § 895.85(3)); *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 694 N.W.2d 320, 324-25 (Wis. 2005). As we explained above, there was enough evidence in the record for the jury to conclude that when Minsor told PSG it could make changes to the prototype forgings, it knew that this was not true. In addition, there is

evidence that Minsor was aware that its misstatement would affect PSG's ability to perform the contract—PSG expressed concern to Minsor about its ability to meet the contract terms if the final forgings contained as much excess material as the prototypes. We also do not agree with Minsor that there is no evidence of an improper motive on Minsor's part. There is evidence that Minsor was on a tight deadline to produce prototypes of the TB knuckle for its customer and that PSG was the only company that said it could produce the prototypes on schedule. Therefore, the jury could have concluded that Minsor wanted to deceive PSG so PSG would continue producing the prototypes even if doing so meant that PSG might have trouble meeting its contractual obligations in the long term. We believe this is enough for the jury to conclude that Minsor intentionally disregarded PSG's rights, and therefore the district court did not err by instructing the jury on punitive damages.

## III.  CONCLUSION

For the above reasons, we AFFIRM the decision of the district court denying Minsor's motions for judgment notwithstanding the verdict and for a new trial.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*