**FLEMING COMPANIES, INC., Plaintiff,**

v.

**KRIST OIL CO., Defendant.**

**No. 03–C–221–C.**

United States District Court, W.D. Wisconsin.

June 16, 2004.

Order Denying Motion to Amend July 20, 2004.

Valerie L. Bailey–Rihn, for Plaintiff.

Donn Atanasoff, Attorney at Law, Iron River, Susan Douglas MacGregor, Kitch Drutchas Wagner Denardis, Marquette, MI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Fleming Companies, Inc. claims that defendant Krist Oil Co. breached the parties' contract by failing to pay for certain merchandise that it ordered from plaintiff. In response, defendant brought five counterclaims: (1) breach of contract; (2) breach of warranty of fitness for a particular purpose; (3) misrepresentation or fraud; (4) violation of the Wisconsin Fair Dealership Act; and (5) any other tort as the facts may justify. Now before the court is plaintiff's motion for summary judgment on its breach of contract claim and on all five of defendant's counterclaims. Jurisdiction is present. 28 U.S.C. § 1332.

Plaintiff's motion will be granted. With respect to plaintiff's breach of contract claim, defendant disputes only the amount owed. Defendant has not shown that the invoices plaintiff submitted to show the amount due are inadmissible for lack of trustworthiness. However, it has adduced some evidence rebutting certain amounts shown on the invoices; accordingly, the invoice totals will be reduced by these amounts.

With respect to all of defendant's counterclaims, defendant has voluntarily waived its claim under the Wisconsin Fair Dealership Act. Its breach of contract claim fails because it has not shown that the services on which its claim is based were terms of the parties' contract. Defendant's misrepresentation, fraud and other unidentified tort claims must fail also. Defendant has not developed any arguments to support its fraud and other unidentified tort claims and its misrepresentation claim is premised on plaintiff's failure to disclose information that it was under no obligation to disclose. Finally, plaintiff will be granted summary judgment with respect to defendant's breach of an implied warranty of fitness for a particular purpose. The implied warranty of fitness for a particular purpose relates to goods and not to circumstances extraneous to their sale.

From the parties' proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

Plaintiff Fleming Companies, Inc. is a wholesale distributor of groceries and other related items. At the time this case was filed, plaintiff was incorporated in Oklahoma and its principal place of business was in Wisconsin. Defendant Krist Oil Co. Inc. operates approximately 62–64 Citgo convenience stores in northern Wisconsin and the Upper Peninsula of Michigan. Defendant is incorporated in Michigan and has its principal place of business there.

For the past 18 years, defendant has purchased some but not all of the merchandise that it stocked in its stores from plaintiff. Defendant placed weekly orders

with plaintiff and in return, plaintiff delivered goods and issued defendant invoices for them. Other than the invoices, there was no written memorialization of the parties' relationship. Both parties believed that either was free to terminate it at any time.

### A. Pre–Conversion System

To place an order from plaintiff, defendant's store managers would manually enter a tag number into a hand-held Telzon unit. Plaintiff provided the tag numbers at no additional costs to its customers for display on the front of the shelf where the item was stocked. Plaintiff made deliveries to defendant's stores from its warehouse in Marshfield, Wisconsin.

Upon delivery, store managers inspected the number of totes (bins in which the groceries were placed) and signed a "load list," acknowledging the delivery and receipt of an invoice. Store managers would count the number of cigarette cartons in the presence of the delivery person because of their high value. In the event that a delivery contained unordered items ("mispicks"), a store manager would note the discrepancy on the invoice and call plaintiff within a short period of time. After completing the appropriate paperwork, plaintiff would issue defendant a credit for the mispicks and have a delivery person remove the items. Plaintiff indicated any out of stock or substituted items on its invoices; it did not charge for out of stock items and defendant was free to reject substitutes. Approximately once a month, one of plaintiff's customer service representatives would visit each of defendant's stores to remove expired items and perform other miscellaneous tasks such as retagging the shelves.

Plaintiff charged defendant the same prices that it charged all of its customers. The invoices indicated that payment was due within seven days of delivery and that collection costs and a 1.2% monthly service charge would be imposed on any past due invoices. Plaintiff notified its customers of price changes on a weekly basis.

Defendant was plaintiff's Marshfield Division's largest customer. Accordingly, plaintiff provided defendant with certain customized information at no additional charge. This information included a custom price book, listing only those products that defendant's store managers were allowed to order and defendant's retail prices that defendant set for each item plaintiff supplied. In addition, plaintiff provided defendant with invoices listing its retail prices.

### B. Conversion to Coremark System

At some point before the summer of 2002, plaintiff purchased Coremark, a convenience store distribution company located on the west coast. By the summer, plaintiff decided to adopt Coremark's purchase ordering system in all of its other divisions, starting with the Marshfield division. In August 2002, plaintiff told defendant about the conversion. Plaintiff indicated that the change would mean that tagging would be based on a six-digit rather than five-digit numbering system, that all other information would remain the same and that plaintiff would continue to accept orders under its old numbering system for six months after it completed the retagging process. In addition, plaintiff assured defendant that the system had been used successfully elsewhere and that the conversion would not disrupt business. Plaintiff gave defendant a choice: either plaintiff's personnel would retag all of defendant's stores free of charge or plaintiff would pay defendant $100 for each store to do the retagging itself. Defendant chose the former. By the end of the summer, plaintiff's Marshfield division had begun the conversion process.

In contrast to plaintiff's assurances, the transition was not smooth. The retagging

of defendant's stores began in September and was mostly complete by November. However, in some instances, the assistance of defendant's employees was needed so that the retagging could be completed in two days. Even after the shelf retagging was complete, software bugs caused problems. Price tags on items did not always correspond to shelf tags and shelf tags did not always correspond to warehouse codes. Some items were priced for retail sale incorrectly and in some instances, below wholesale cost. Plaintiff charged defendant for items that were never delivered and others that were delivered but not ordered. Under the Coremark system, defendant sought a substantially higher rate of credits for mispicks, misdeliveries, non-deliveries, outdated products and inappropriate substitutions than it had prior to conversion. In addition, defendant experienced a drop-off in customer service from plaintiff. Plaintiff failed to respond to several of plaintiff's phone calls and written inquiries, stopped providing customer service visits and sometimes delayed in issuing defendant credits.

### C. *Termination*

In late November 2002, defendant began looking for another supplier and decided upon one by early December. At some point that December, defendant asked plaintiff to conduct a "clean sweep" of all its stores to remove items that had been improperly ordered, improperly delivered or that were out of date. Plaintiff agreed and by the end of the month, had conducted sweeps in a number of defendant's stores. Additionally, defendant complained about the change in the invoice formatting; defendant found the new invoices more difficult to input into its own inventory system because items were no longer grouped as they had been and the new invoices did not list defendant's retail pricing.

On December 30, 2002, defendant sent plaintiff a letter informing it that defendant was terminating the parties' relationship and switching suppliers. Plaintiff continued to sell to defendant until defendant's new supplier, Chamber and Owens, completed its retagging of each of defendant's stores. The retagging was completed by the end of February 2003 and defendant ceased purchasing from plaintiff after that point.

Between September 1, 2002 through February 28, 2003, plaintiff's sales to defendant totaled $4,443,837.17, including the amounts defendant has not paid. During this same time, the credits that plaintiff issued to defendant totaled $132,231.51. At the time defendant sent the termination letter, its open account balance with plaintiff was approximately $1.5 million. By the end of February 2003, the balance was approximately $1 million. Defendant has refused to pay this balance.

### OPINION

### A. *Plaintiff's Breach of Contract Claim*

#### 1. *Liability*

■ Plaintiff claims that defendant breached the parties' contract by failing to make payment on invoices totaling $1,059,437.33. In opposing this claim, defendant argues only that there is a dispute as to the amount owed. By challenging only the amount due, I assume that defendant concedes that it is liable in contract for at least part of the remaining balance. *See* Dft.'s Br., dkt. # 33, at 4 ("the amount due is not the amount reflected on the invoices").

#### 2. *Damages*

##### a. Reliability of invoices

■ The real issue in this case is the amount of damages plaintiff will be able

to recover for this breach. Defendant challenges plaintiff's reliance on the unpaid invoices totaling $1,059,437.33, arguing that many of the invoices contain errors rendering them all unreliable. In support of its assertion, defendant argues that "it can and will demonstrate that the 'amount due' reflected on the invoices are unreliable. As an example of the proof that can and will be presented at trial see the Affidavit of Theresa Bernier attached as Exhibit B." Dft.'s Br., dkt. # 33, at 5. Defendant's comment reflects a misunderstanding about the function of summary judgment.

The purpose of a motion for summary judgment is to determine whether a trial is warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). To defeat a motion for summary judgment, a party must submit evidence from which a reasonable trier of fact could find in its favor; it is not enough to simply allege that a material dispute exists. *Id.* at 247–49, 106 S.Ct. 2505 ("the mere existence of some *alleged* factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment") (emphasis added). "[S]ummary judgment 'is the put up or shut up moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir.2003) (quoting *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 504 (7th Cir.1999)). It is not enough that defendant asserts that it *will* be able to show that the invoices are unreliable at trial; it must support this assertion with admissible evidence. For the reasons explained below, the single exemplary piece of evidence that defendant cites is insufficient.

Generally, documents prepared in the normal course of business are admissible to prove the matters asserted therein. Fed.R.Evid. 803(6). Regularly kept business records are excepted from the hearsay rule because an inference of accuracy and reliability can be drawn from the fact that they are regularly maintained and the company maintaining them relies on them in conducting its business. *Id.* advisory committee's note ("The element of unusual reliability is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."). To be admissible under the business record exception, a document must be prepared in the normal course of business, at or near the times of the events it records and based on the personal knowledge of the entrant or the personal knowledge of a person having a business obligation to inform the entrant. *Datamatic Services, Inc. v. United States*, 909 F.2d 1029, 1032 (7th Cir.1990).

An exception to the rule applies when "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Defendant does not argue that the invoices do not qualify as a business record; instead, its argument in essence is that they are subject to this exception. In support of its argument, defendant relies on the affidavit of one of its store managers and the two invoices attached thereto. A district court has broad discretion in determining whether circumstances show that a document may be untrustworthy and therefore, inadmissible under the business records exception. *Coates v. Johnson & Johnson*, 756 F.2d 524 (7th Cir.1985) (trial court has

broad discretion in determining applicability of business records rule). *See also McNeese v. Reading & Bates Drilling Co.,* 749 F.2d 270 (5th Cir.1985) (broad discretion in making trustworthiness determination); *United States v. Patterson,* 644 F.2d 890 (1st Cir.1981) (same); *United States v. Licavoli,* 604 F.2d 613 (9th Cir.1979) (same).

The single affidavit casts little doubt on the reliability of the invoices. In her deposition, Bernier, one of defendant's store managers, states that the post-conversion invoices were illogically organized (¶ 8), failed to identify items as taxable or non-taxable accurately (¶ 9) and contained errors regarding retail pricing (¶¶ 10–11). Bernier Aff., dkt. # 37, at 1–2. None of these shortcomings supports defendant's position that the invoices are unreliable records *of its debt to plaintiff.* Even if I were to assume that Bernier's assertion that the invoices were illogically organized is something more than a mere opinion, it cannot be assumed that the invoices were inaccurate simply because they were not organized "logically." Moreover, neither the listed retail prices nor the taxation categorization had any bearing on the amount plaintiff charged defendant; these listings simply provided information for defendant's internal operations. In any event, defendant's contention that there were *errors* in the retail price listings makes no sense in light of the undisputed fact that the newer invoices listed standard suggested retail prices; discrepancies between suggested retail prices and defendant's retail prices are not errors and their existence is neither surprising nor suspicious.

■■ I will not consider the two sample marked-up invoices attached to Bernier's affidavit. This court's procedural rules make clear that all evidence a party wishes the court to consider must be made the subject of a proposed fact. *Procedure to be Followed on Motions for Summary Judgment,* I.B.1. *attached to* Preliminary Pretrial Conference Order, dkt. # 12 ("Each fact should be proposed in a separate, numbered paragraph"). *See also Helpful Tips for Filing a Summary Judgment Motion in Cases Assigned to Judge Barbara B. Crabb, attached to* Preliminary Pretrial Conference Order, dkt. # 12 ("All facts necessary to sustain a party's position on a motion for summary judgment must be explicitly proposed as findings of fact."). When parties fail to comply with district court's summary judgment procedures, the proper response is to disregard nonconforming submissions. *Ziliak v. AstraZeneca LP,* 324 F.3d 518 (7th Cir.2003). The invoices underscore the importance of complying with the rule that facts must be explicitly proposed. It is nearly impossible to discern the meaning of the cryptic markings on these invoices. One of the purposes of the rule is to flesh out the meaning and significance of the evidence and allow the opposing party an opportunity to determine whether the proposed fact can be inferred from the evidence.

In any event, I am not persuaded that the existence of some errors, apparently unrelated to the issue of the amount defendant owes plaintiff, renders all of the invoices inadmissible for lack of reliability. If the existence of random errors were enough to avoid application of the business records rule, the exception would swallow the rule. *Patterson,* 644 F.2d at 901. Accordingly, I conclude that the invoices are admissible to show the amount that defendant owed plaintiff.

b. Credits due

■ Next, defendant contends that the invoices do not reflect a number of credits to which it is entitled. In support of its argument, defendant relies on its response to plaintiff's proposed findings of fact ¶¶ 51

and 63. In these responses, defendant asserts that the December 2003 sweep did not occur in all of its stores and cites the depositions of two of its store managers. Although both managers acknowledged that plaintiff failed to conduct certain sweeps that they had expected, neither of the managers could provide any detail about the amounts allegedly due. Andrini Depo., dkt. # 41, at 14 ("Q: Do you recall how much of credits (sic) you believe were still missing when you converted to Chambers and Owen; A: I can't give an exact figure."); Mecha Depo., dkt. # 42, at 11 ("Q: Do you know what the total amount was? Is there anything at your store that would tell you that?; A: I don't have anything ... no, I don't have everything.").

In addition, defendant makes broad, sweeping statements about additional credits of unspecified amounts for which it seeks recovery. *See, e.g.*, Dft.'s Br., dkt. # 33, at 5–6 ("[Defendant] requested credit far in excess of the credits reflected in the email .... Although [defendant] followed [plaintiff's] procedure ... [defendant] never got credit for the merchandise it returned to [plaintiff]."). However, it does not substantiate these assertions with evidence of entitlement or even specific numbers. *Cf.* Wis. Stat. § 402.605 (in contract for sale of goods, buyer may waive right to reject nonconforming deliveries if buyer fails to particularize grounds for rejection).

From September 1, 2002 through February 28, 2003, plaintiff issued defendant credits totaling $132,231.51. In its reply brief, plaintiff says that it is "willing to concede that its judgment should be reduced by an additional $30,584.61, reflecting credits in e-mails sent by store managers to [plaintiff] for goods that allegedly had not been picked up at the final sweep." Plt.'s Br., dkt. # 38, at 3–4. Defendant has had more than ample time to discover other discrepancies; its relationship with

plaintiff ended over fifteen months ago and this case was filed over a year ago. Defendant will not be allowed to suspend its obligation to pay plaintiff by hiding behind broad unsubstantiated allegations of entitlement for indeterminate sums. As noted above, if defendant has other *evidence* of entitlement to additional credits, summary judgment was the time to come forward with it. Because plaintiff has submitted admissible evidence that defendant owes it at least $1,028,842.70, and defendant has failed to adduce any evidence contradicting this amount, plaintiff will be awarded $1,028,842.70.

### B. *Defendant's Breach of Contract Claim*

#### 1. *Statute of frauds*

■ Defendant claims that plaintiff breached the parties' contract by failing to provide certain delivery and distribution services during its conversion to the Coremark system. Plaintiff argues that defendant's breach of contract claim must fail because there is no writing describing the nature of the parties' service relationship. Under the Uniform Commercial Code's statute of frauds, a contract for the sale of goods for over $500 generally is not enforceable unless there is "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Wis. Stat. § 402.201(1). Both parties agree that because their contract is for the sale of goods over $500, it is governed by Wisconsin's codification of the Uniform Commercial Code.

Plaintiff does not deny that the parties have contracted for the sale of goods; it asserts only that there is no memorialization of the *service aspect* of the relationship. However, the code's statute of frauds requires only a writing "sufficient to indicate that a contract for sale has

been made between the parties." *Id.* It is clear that it "need not contain all the material terms of the contract .... The only term which must appear is the quantity term." *Id.* cmt. 1. Plaintiff overstates the scope of this rule by suggesting that it would render unenforceable any unwritten service obligations it may have had as part of its duty to provide goods. If plaintiff meant to suggest that the service arrangement was in essence separate from the sale of goods, the service agreement would not be subject to the code's statute of frauds.

### 2. *Incidental services*

Alternatively, plaintiff argues that defendant's breach of contract claim is based on incidental services that it provided to defendant that were not part of the parties' contract. Defendant disagrees, arguing that these services were made part of the parties' contract through past course of dealing, usage of trade and the Uniform Commercial Code generally. Although some courts limit supplementary terms to the "gap-filling" provisions of the UCC, the Court of Appeals for the Seventh Circuit has held that under Wisconsin law, all of the UCC's provisions should be used in discerning terms of contract under § 2–207(3), including those that may be implied from parties' course of performance, course of dealing and usage of trade. *Dresser Industries, Inc. v. Gradall Co.,* 965 F.2d 1442, 1450–52 (7th Cir.1992) ("Thus, a court is not limited to the standardized gap-fillers of Article 2, but may utilize any terms arising under the entire U.C.C."). *See also Restatement (Second) of Contracts* § 223 ("a course of dealing between the parties gives meaning to or supplements or qualifies their agreement").

 Beyond asserting that plaintiff's provision of services had become a contractual obligation by virtue of common trade practice and the parties' past practice, defendant has failed to develop its argument. First, defendant has not attempted to specify how the alleged contract terms were derived from usage of trade, course of dealing or other provisions of the uniform commercial code. A "usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade." Wis. Stat. § 401.205(2). Because defendant has proposed no facts regarding any such regular practice or method or indicated in its brief which if any of the services were industry standards, I will disregard its reference to usage of trade as a source of contractual terms. I will disregard as well defendant's reference to Wis. Stat. § 401.203, which requires parties to perform their contractual obligations in good faith. Defendant did not allege a breach of the duty of good faith in its counterclaim, Dft.'s Cntr. Cl., dkt. # 22, at 9–11, and in its brief opposing plaintiff's motion for summary judgment does not attempt to explain what the applicable "reasonable commercial standards of fair dealing in the trade" are, which service-related shortcomings fail to meet these standards or why. *Id.* cmt.

 Although course of dealings may provide a basis for inferring the existence of a particular contract term, this does not mean that every historically conferred benefit is thereby rendered a contractual obligation. Generally, Wisconsin courts are wary of implying terms into a contract to which the parties have not expressly agreed. Michael B. Apfeld *et al., Contract Law in Wisconsin* § 5.72 (2d ed.2002). Thus, defendant's claim survives only to the extent that it is reasonable to infer from the course of dealings that the parties understood the obligatory nature of plaintiff's provision of certain services and agreed to it.

Further complicating the issue, defendant has not specified those *deficiencies* which it believes constitutes a·breach. It identifies plaintiff's "reliable ordering procedures and accurate and logical invoicing" as the primary distribution processes that were disrupted by the conversion. Dft.'s Br., dkt. # 33, at 13. Accordingly, I assume from its proposed facts that defendant intended to refer to plaintiff's failure to provide price books and invoices that are organized in a particular fashion and list defendant's standard retail prices.

With respect to defendant's claim based on changes in invoicing, it is unreasonable to assume that plaintiff was obligated to provide invoices that were organized in a certain manner and that list defendant's retail prices simply because it had done so in the past. Defendant has produced no evidence that the parties ever discussed these aspects of invoicing at any time prior to the conversion. As a general matter, businesses control the organization and content of their own documents. Moreover, there is no suggestion that plaintiff even knew that defendant relied on the previous invoice format or retail price listings, let alone the extent of defendant's reliance. In addition, it is unreasonable to infer that the parties had agreed implicitly that plaintiff was obligated to provide defendant with a price book listing only those items that defendant's store managers were permitted to purchase simply because it had done so in the past. Defendant has shown no reason to assume that the parties would have understood that plaintiff was obligated to provide defendant with resources to assist it in regulating its employees' actions. None of the evidence shows that the parties ever discussed this book prior to the conversion.

 If defendant intended its breach of contract claim to extend further, it is impossible to discern from its brief what its intent was. As the party attempting to recover for breach, defendant bears the burden of proving that the existence of the contractual obligation on which the claim is based. *Household Utilities, Inc. v. Andrews Co., Inc.,* 71 Wis.2d 17, 28, 236 N.W.2d 663, 669 (1976). It is insufficient for defendant merely to assert that the "'value added' elements of [plaintiff's] 'turnkey' distribution operation" were made terms of the parties' contract by virtue of past practice, course of dealing and usage of trade. Dft.'s Br., dkt. # 33, at 12, 17. Defendant fails to identify these value added elements, let alone attempt to explain how or why they became terms of the parties sales agreement. "Arguments not developed in a meaningful way are waived." *Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999).

### D. *Defendant's Misrepresentation, Fraud and Other Tort Claims*

Next, defendant contends that plaintiff is liable to it under fraud, misrepresentation or·some other yet unidentified tort theory for telling it that the transition to the Coremark system would involve only minor changes and would not disrupt defendant's business. In its brief, defendant lays out the various theories of fraud and misrepresentation available under Michigan and Wisconsin state law and the elements a party must prove to recover under each. However, it neither indicates which state's law it believes governs nor explains why. Because defendant has failed to make any arguments for the application of Michigan law and, in pursuing its other counterclaims, has assumed that Wisconsin law governs the parties' relationship, I will disregard its references to Michigan law.

Further, defendant does not explain how its evidence satisfies the elements of any of these torts. Defendant contends that

plaintiff was under an obligation to inform it that this would be the first conversion from Fleming's old system to the Coremark system and that there were a "multitude of 'unknowns.'" Defendant argues that as a result of plaintiff's failure to disclose this information, defendant was "lulled into assuming that the conversion would not be disruptive to [its] business." Dft.'s Br., dkt. # 33, at 9–10. Because defendant's argument relates only to a failure to disclose and does not identify an affirmative misrepresentation, I will disregard its references to those misrepresentation theories based on affirmative misstatements.

■ Wisconsin recognizes misrepresentation based on a failure to disclose facts. *Ollerman v. O'Rourke Co., Inc.,* 94 Wis.2d 17, 26, 288 N.W.2d 95 (1980) ("If there is a duty to disclose a fact, failure to disclose that fact is treated in the law as equivalent to a representation of the non existence of the fact."). However, a party must show that there was a duty to disclose under the law. *Tietsworth v. Harley–Davidson, Inc.,* 2004 WI 32, ¶ 12, 270 Wis.2d 146, 677 N.W.2d 233, 238 ("It is well-established that a nondisclosure is not actionable as a misrepresentation tort unless there is a duty to disclose.").

■ Whether there is a duty to disclose is a question of law, but one rooted in policy considerations subject to judicial determination. *Ollerman,* 94 Wis.2d at 27–28, 288 N.W.2d 95. ("'There is a duty if the court says there is a duty.'") (quoting Dean Prosser, *Palsgraf Revisited,* 52 Mich. L.Rev. 1, 14–15 (1953)). Typically, a duty to disclose might be found in a cases in which a seller conceals a defect, prevents investigation, has told a half-truth or made an ambiguous statement, where the seller has a fiduciary duty to the seller or "where the facts are peculiarly and exclusively within the knowledge of one party to the transaction and the other party is not in a position to discover the facts for himself." *Id.* at 30–31, 288 N.W.2d 95. "The crucial element in determining whether a duty of disclosure exists is whether the mistaken party would reasonably expect disclosure." *Hennig v. Ahearn,* 230 Wis.2d 149, 166, 601 N.W.2d 14, 22 (Ct.App.1999).

■ Defendant does not contend that plaintiff knew that the transition would be disruptive to defendant's business; instead, it argues that plaintiff had a duty to inform it that there were "unknowns" because it had not yet attempted the conversion to the Coremark system. In essence, defendant's theory is that plaintiff had a duty to tell plaintiff the extent of what it did not know. Defendant's argument is not persuasive. Although plaintiff assured defendant that the system had been *used* successfully elsewhere, it said nothing about any previous *conversions.* Moreover, no sophisticated business entity would expect another business to highlight potential, unforeseen problems or would it take as a guaranty assurances that a process will go smoothly, especially where no such a guaranty is possible. "The business world, and the law reflecting business mores and morals, require[s] the parties to a transaction to use their faculties and exercise ordinary business sense, and not to call on the law to stand in loco parentis to protect them in their ordinary dealings with other business people." *Ollerman,* 94 Wis.2d at 30, 288 N.W.2d 95. Because plaintiff was under no obligation to inform defendant of the possibility that the conversion process might not go as smoothly as hoped or anticipated, plaintiff will be granted summary judgment with respect to defendant's misrepresentation claim.

### E. *Defendant's Claim of Breach of Warranty of Fitness for a Particular Purpose*

■ Finally, defendant contends that plaintiff breached an implied warranty

that its procedures and systems would be fit for ordering, distribution, servicing and invoicing. Dft.'s Cntr. Cl., dkt. # 33, at 11. Defendant argues that plaintiff knew that it depended on plaintiff to furnish procedures suitable for these purposes. *Id.* (In its brief opposing summary judgment, defendant asserts that its claim is based on an "express warranty relative to the nature and scope of the conversion, and the likely consequences of going through the conversion." Dft.'s Br., dkt. # 33, at 11. However, defendant pleaded only breach of an implied warranty of fitness for a particular purpose. Dft.'s Cntr. Cl., dkt. # 33, at 11. Defendant will not be allowed to pursue new claims not raised in its pleadings. Although pleading standards are lenient, a party must at least provide the opposing party with notice of the nature of its claim. Fed.R.Civ.P. 8(a). *See also* Plt.'s Br., dkt. # 25, at 17–18 (arguments address only warranty for particular purpose claim).)

The Wisconsin codification of the Uniform Commercial Code does provide that a warranty for a particular purpose is implied in certain circumstances; however, the warranty is implied only as to the goods sold and not to circumstances extraneous to their sale. Wis. Stat. § 402.315 ("Where the seller at the time of contracting has reason to know any particular purpose for which the *goods* are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable *goods,* there is ... an implied warranty that the *goods* shall be fit for such purpose."). Because defendant's claim does not relate to the goods sold but only to the manner of their sale, it fails as a matter of law. Accordingly, plaintiff's motion for summary judgment will be granted with respect to this counterclaim.

### ORDER

IT IS ORDERED that plaintiff Fleming Companies, Inc.'s motion for summary judgment will be granted with respect to its breach of contract claim. FURTHER, IT IS ORDERED that plaintiff's motion for summary judgment will be granted with respect to defendant Krist Oil Co., Inc.'s breach of contract, breach of warranty, misrepresentation, fraud fair dealership act and other unidentified tort counterclaims. Plaintiff is awarded $1,028,842.70 on its breach of contract claim. The clerk of court is directed to enter judgment in favor of plaintiff and close this case.

### OPINION and ORDER

This is civil action in which plaintiff Fleming Companies, Inc. sought monetary damages, alleging that defendant Krist Oil Co. breached the parties' contract by failing to pay for certain merchandise that it ordered from plaintiff. In response, defendant brought five counterclaims: (1) breach of contract; (2) breach of warranty of fitness for a particular purpose; (3) misrepresentation or fraud; (4) violation of the Wisconsin Fair Dealership Act; and (5) any other tort as the facts may justify. In an order dated June 16, 2004, I granted plaintiff's motion for summary judgment with respect to its breach of contract claim and all five of defendant's counterclaims. Because plaintiff was entitled to judgment on all claims, the case was closed. Now defendant has filed two motions: one to amend its counterclaims under Fed. R.Civ.P. 15(a) and another to alter or amend the judgment pursuant to Fed. R.Civ.P. 59(e) or alternatively for relief from the judgment under Fed.R.Civ.P. 60(b). Both motions will be denied.

### A. *Motion to Alter or Amend*

1. *Plaintiff's breach of contract claim*

In concluding that plaintiff was entitled to judgment in the amount of $1,028,842.70, I reasoned that defendant had conceded liability, that plaintiff had

submitted invoices totaling $1,059,437.33 showing the amount due and that defendant had put only $30,584.61 of that total into dispute. In arguing that this conclusion was erroneous, defendant raises two interrelated arguments: (1) the court erroneously concluded that the invoices were conclusive on the issue of the amount owed simply because it found them to be admissible; and (2) the court improperly shifted the burden to defendant to show the amount due.

Defendants' first argument is flatly contradicted by the language in the holding. The invoices were not considered conclusive simply because they were found to be admissible; had they been, plaintiff would have been awarded the full $1,059,437.33. Instead, I concluded that plaintiff was entitled to judgment in the amount of $1,028,842.70 "[b]ecause plaintiff has submitted admissible evidence that defendant owes it at least $1,028,842.70, *and defendant has failed to adduce any evidence contradicting this amount."* Op. & Order, dkt. # 44, at 14. The invoice figures were reduced to the extent that defendant had submitted evidence calling them into question. (Plaintiff agreed to reduce the amount it was seeking by this amount, making trial unnecessary.)

■ Next defendant argues that the court shifted the burden to it to prove the amount due. Defendant was held only to the standard facing every party opposing a motion for summary judgment. As Fed. R.Civ.P. 56(e) states clearly,

> When a motion for summary judgment is made and supported as provided in this rule, *an adverse party* may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.*

(Emphasis added). Certainly, plaintiff bears the burden of proving its damages. To this end, plaintiff proffered invoices that defendant concedes are admissible to show the amount due. However, defendant did not adduce evidence containing specific facts showing that there is a genuine issue with respect to $1,028,842.70 of the total $1,059,437.33 amount shown on the invoices. Although the jury must resolve discrepancies where the parties submit conflicting evidence as to damages, *Brogan v. Industrial Casualty Ins. Co.,* 132 Wis.2d 229, 239, 392 N.W.2d 439, 444 (Ct.App.1986), there was no conflict with respect to the sum awarded.

As I noted in the order, the three affidavits that defendant cited in support of its arguments did not create a material issue of fact with respect to the $1,028.842.70. In one of the affidavits, the affiant noted that two invoices contained certain errors that were totally unrelated to the amount due. In the others, two of defendant's store managers averred that additional credits were due but could not say how much. (In a footnote, defendant notes that one of these three affiants had stated that there were "likely errors on the invoices of stores managed by less experienced people that were never picked up." Dft.'s Br., dkt. # 49, at 3 n. 2. "Memorializing mere speculation in the form of an affidavit does not convert the speculation into competent evidence." *Gonzalez v. Litscher,* 230 F.Supp.2d 950, 962 (W.D.Wis.2002).)

■ Defendant appears to reason that a jury could infer from the existence of some errors the existence of others for which there is no evidence. Defendant's theory calls for speculation on the part of the jury. Juries are entrusted to weigh credibility and draw inferences, but they may not speculate. *Featherly v. Continental Insurance Co.,* 73 Wis.2d 273, 280,

243 N.W.2d 806, 812 (1976); *Ianni v. Grain Dealers Mutual Insurance Co.*, 42 Wis.2d 354, 364, 166 N.W.2d 148, 153 (1969). *See also McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir.2003) (speculation does not create material factual dispute). The errors defendant highlighted represented only a slight fraction of the total invoiced amounts. At no point did defendant contend that there was any regularity or predictability to the errors such that it might be reasonable to infer errors for which there is no other evidence.

■■■■ Finally, defendant stresses the fact that it had indicated in its opposition brief that it could and would prove that the invoice amounts were inaccurate at trial. As I have already explained, it is not enough that defendant asserts that it will able to show that the invoices are unreliable at trial; summary judgment is the time it must show that it has admissible evidence for trial. Fed.R.Civ.P. 56(e); *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir.2003). It is too late for defendant to submit additional evidence to bolster its position. "Motions for a new trial or to alter or amend a judgment must clearly establish either a manifest error of law or fact or must present *newly discovered evidence.*" *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986) (emphasis added). The affidavit defendant submits merely clarifies the meaning of certain markings found on an invoice that was already submitted; there is nothing "newly discovered" about it. Defendant provides no explanation why it could not have produced the evidence earlier. In addition, defendant points to evidence it had submitted earlier but did not refer to in its proposed findings of fact. This court's procedures make clear that evidence cannot be considered unless it is made the subject of proposed findings of facts. *See Procedure to Be Followed on Motions for Summary Judgment*, I.B.3; I.C.I, *attached to* Preliminary Pretrial Conference Order, dkt. # 9 ("The court will not search the record for evidence."). Neither Rule 59(e) nor 60(b) was designed to give a losing party a belated second bite at the apple.

2. *Defendant's misrepresentation counterclaim*

■■■■ As I noted in the June 16 opinion and order, defendant failed to explain how its evidence satisfied the elements of the six theories of fraud and misrepresentation available under Michigan and Wisconsin state law. Because defendant did not identify any statements plaintiff made to it in its argument, I disregarded defendant's reference to those theories that were based on affirmative misrepresentations. Defendant contends that this was error because the undisputed facts indicate that plaintiff made certain affirmative statements that defendant now identifies as being the basis for its misrepresentation claim. "Arguments not developed in any meaningful way are waived." *Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999). It is defendant's burden to explain how evidence in the record supported a particular argument or theory. Even in arguing that the court erred in not considering these statements as the basis of its claim, defendant still does not explain why or how it satisfied the order elements making out a claim of affirmative misrepresentation. Thus, defendant's argument provides no basis for altering the outcome even if I were to accept it.

■■■■ Finally, defendant reargues its non-disclosure misrepresentation claim. However, defendant does not explain why it considers the June 16 order erroneous or why plaintiff had a duty to disclose additional information regarding the scope and breadth of its conversion to a new

inventory system. In any event, rule 59(e) is not a mechanism for reargument of issues that have been decided.

### B. *Motion to Amend*

In its second motion, defendant seeks leave to amend its counterclaims. Because this case is closed, the request to amend the pleadings will be denied. "It is well-settled that after a final judgment, a plaintiff may amend a complaint under 15(a) only with leave of court after a motion under Rule 59(e) or 60(b) has been made and the judgment has been set aside or vacated." *Figgie International Inc. v. Miller*, 966 F.2d 1178, 1179 (C.A.7 1992). For the reasons explained above, I have already concluded that defendant is not entitled to relief under either of those rules. Accordingly, defendant's motion to amend will be denied.

### ORDER

IT IS ORDERED that defendant Krist Oil Co.'s motion to alter or amend the judgment in this case pursuant to Fed. R.Civ.P. 59(e) or in the alternative for relief from the judgment under Fed. R.Civ.P. 60(b) is DENIED. In addition, defendant's motion to amend its counterclaims under Fed.R.Civ.P. 15(a) is DENIED.