McCoy and wife, Respondents, *vs.* May, Appellant.

*May 3—June 7, 1949.*

For the appellant there was a brief by *Bassuener, Humke, Poole & Axel* of Sheboygan, and oral argument by *John M. Poole*.

For the respondents there was a brief by *Whiffen & Walter* of Sheboygan, and oral argument by *C. F. Whiffen* and *John S. Walter*.

WICKHEM, J. Prior to October 16, 1946, the Engineering Manufacturing Company, a corporation, operated its business in the city of Sheboygan. It was being managed by one William H. Murphy of Chicago as trustee under the will of Harry DeLyle, deceased. The company, including all of its assets, was owned by Mary McCoy and Carmelete Keady who were residuary legatees under the will of Harry DeLyle. Mary McCoy is a sister of plaintiff, Peter McCoy, and is a resident of Illinois. Carmelete Keady is a resident of California. Prior to 1946, defendant, Elwood H. May, resided in Rockford, Illinois, and was engaged in the sport-packaging business. Prior to that time plaintiff, Peter McCoy, was manager of a Montgomery Ward store at La Porte, Indiana. In the year 1944 and afterwards, Peter McCoy approached defendant May with reference to purchasing the assets of the Engineering Manufacturing Company. McCoy did not in November of 1946 have available the cash necessary to undertake the purchase of this business. He entered into a written agreement with May in respect of the purchase of this business. A writing was executed by plaintiffs, May and his wife. It recited that the undersigned have agreed by written contract to purchase from Carmelete Keady and Mary McCoy certain assets of the Engineering Manufacturing Company of Sheboygan. It is further recited that pursuant to the terms of this agreement a Wisconsin corporation is to be organized to which all of the assets purchased are to be transferred, and that this corporation is to assume such liabilities as the assets are subject to. It is recited that whereas the down payment of $18,750 has been wholly furnished by the Mays the stock of this corporation is to be issued, one half in the name of Elwood H. May and one half in the name of his wife, Mary, and by them pledged as security for promissory notes to be issued for the balance of the purchase price. It is further stipulated that it is the desire of the Mays to give the McCoys "certain options and privileges to pur-

chase certain of said capital stock of said corporation. . . ." It was agreed that ". . . from the date of the issuance of the stock of said corporation to the first parties, and until October 17, 1947, the first parties hereby give to the second parties the option to purchase from first parties not more than fifty (50%) per cent of the stock of the corporation so issued to first parties. . . ." In execution of the agreement the purchase was consummated and a new corporation organized. This corporation had an authorized capital stock of three hundred seventy-five shares at $50 per share. One half of the shares were issued to Elwood H. May and the other one half to his wife. Notes for the deferred payments on the purchase price were then issued by the corporation and the stock pledged as collateral security for the payment thereof. May became president and McCoy became secretary-treasurer of the company.

In May of 1947, McCoy advanced $5,500 for working capital of the corporation. On or about June 16th, McCoy told May that he wished to purchase one hundred twenty shares of stock amounting to $6,000. He then went on a trip for the company and returned in August. In September, 1947, he reimbursed himself for some $5,500 advanced for working capital and on September 10, 1947, picked up and paid for one hundred twenty shares of stock heretofore referred to.

May testified that McCoy did not say anything to him about the transfer of any further stock and that McCoy made no demand for any further stock until October 27, 1947, which was ten days after the expiration of his option to purchase; that on that date May asked McCoy if he had paid the corporation notes which were to be due on November 6, 1946, and that May then informed him that his option had lapsed. McCoy, on the other hand, testified that on September 10, 1947, when he acquired the one hundred twenty shares of stock referred to, May asked him how much stock he wanted

and that he then said he wanted all of the one hundred eighty-seven and one-half shares.

We are of the view that there is credible evidence to sustain the finding of the trial court that on September 10th plaintiffs exercised their option to purchase enough stock to constitute one-half ownership in the company. This appeal really turns upon contentions by the defendant that inadmissible evidence tending to vary the written agreement between the parties was admitted to defendant's prejudice. A great deal of testimony was admitted consisting of conversations, negotiations, and of the circumstances forming the background of the enterprise in which the McCoys and the Mays were proposing to embark and which was integrated into the contract above referred to.

We shall attempt no detailed analysis of this testimony further than to say that while some of it appears to be directed to the interpretation of the contract, some of it appears to constitute an attempt to vary the writing by parol evidence. This, however, we deem to be immaterial and not to constitute prejudicial error for the reason that the trial court ultimately found in favor of defendant upon this point, at least for the purposes of his decision.

The trial court's memorandum states that, "For the purpose of this decision I consider the original agreement dated November 11, 1946, to be an option rather than a contract of sale." Portions of the memorandum indicate that this conclusion is against the trial court's notion of the purpose of the agreement. "I am satisfied it at all times was the intention of both May and McCoy that each was to have an equal interest. . . . The surrounding facts and circumstances come close to making the agreement a contract of sale rather than an option. . . . I find that on October 16, 1946, . . . it was the intention of May and McCoy to have equal interests in the business. At all times thereafter it was the intention of McCoy to be on an equal footing with May, and May was

aware of McCoy's intention." Defendant claims that while the trial court did not, as a result of this evidence, actually vary the terms of the agreement it was influenced by it to find favorably to the McCoys upon the issue whether the latter had exercised the option. The general rule is that, while rules of evidence apply in actions tried to the court, it will be presumed, if there is proper evidence to support the findings of the trial court, that the court disregarded any evidence improperly admitted. This is a particularly strong presumption in respect of rules of evidence, the real purpose of which is to avoid biasing an inexperienced and lay jury. We are asked to conclude that, because the evidence improperly admitted induced a private view by the trial court that the writing was really intended to give the parties equal ownership of the business, it led him to feel that the equities were in favor of plaintiffs, and thus the more readily to hold that the option which he assumed to be present in the contract was actually exercised by McCoy. In other words, the claim is that the admission of the improper evidence biased the court in its resolution of a close and critical issue of fact and that therefore there should be a new trial.

We do not find the materials for such a conclusion in the record. As the trial court rejected the conclusion to which all this evidence led and treated the contract as containing an option, we discover no basis for attributing to the trial court a determination indirectly to give this evidence effect by finding against his own convictions that the McCoys actually exercised their option. We are therefore required to hold in accordance with the great weight of authority in this state and elsewhere that there is no indication in the record that evidence erroneously admitted necessarily affected the court's findings upon the critical issue involved. In this connection see *Duncan v. Duncan,* 111 Wis. 75, 86 N. W. 562; *Hannah v. Knuth,* 161 Wis. 467, 154 N. W. 985; *Hilton v. Rahr,* 161 Wis. 619, 155 N. W. 116; *Kelley v. Crawford,* 112 Wis. 368,

88 N. W. 296; *Hill v. American Surety Co.* 112 Wis. 627, 88 N. W. 642; *Behnke v. Kroening,* 174 Wis. 224, 182 N. W. 837; *Estate of Southard,* 208 Wis. 150, 242 N. W. 584.

It is next contended that the tender made by plaintiffs to defendant on October 31, 1947, was insufficient. It appears from the record not only that no question was ever raised concerning this in the lower court but that defendant specifically disclaimed any purpose to raise the issue. Upon those circumstances we do not examine the merits of the contention.

It is finally contended that defendant, Mary May, wife of Elwood H. May, was "a necessary party to this action in order to confer jurisdiction on the court to make a full and complete determination of the rights and interests of all the parties to the transaction." Since the objection to the nonjoinder of Mrs. May was not raised by demurrer or answer it is obvious that unless she was an indispensable party under sec. 260.19, Stats., the objection has not been properly preserved. In other words, is the failure to join Mrs. May a mere defect of parties such as is waived by failure to make objection by answer or demurrer, or is the situation one where her presence was necessary to a complete determination of the controversy? Defendant contends that the Mays and the McCoys respectively are jointly interested under the written agreement involved in this case and that there is applicable to the case the statement in *Bank of Verona v. Stewart,* 223 Wis. 577, 270 N. W. 534, that a "joint liability on choses in action implies that, 'though each person subject to it is liable for the whole, they are all treated in law as together constituting one legal entity, and must be sued together or a release to one will operate in favor of all. . . .'" See also in this connection *Shutts v. Chafee,* 48 Wis. 617, 4 N. W. 763; *McDougald v. New Richmond R. M. Co.* 125 Wis. 121, 103 N. W. 244; *Simpson v. Cornish,* 196 Wis. 125, 218 N. W. 193.

Granting that Mrs. May is a proper or even a necessary party she was not an indispensable party. The failure to join

Mrs. May might have been reached by a demurrer or answer but she does not fall within the definition of an indispensable party. The husband here was liable for the whole performance, this could be had out of stock in his hands, and the wife was without the jurisdiction. In *Silver King Coalition Mines Co. v. Silver King C. M. Co.* (8th Cir.), 204 Fed. 166, 169, the rule is set forth that "an indispensable party is one who has such an interest in the subject matter of the controversy that a final decree cannot be rendered between the other parties to the suit without radically and injuriously affecting his interest, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience." We discover no such situation here. A good illustration of the sort of situation in which a party is held to be indispensable is to be found in *Patitucci v. Gerhardt,* 206 Wis. 358, 240 N. W. 385.

It is finally contended that even if Mrs. May is not an indispensable party judgment should have been that May turn over thirty-three and three-fourths shares of stock rather than the sixty-seven and one half required of him. We reject this contention because he is liable for full performance and his rights under the circumstances are against his wife for one half of the shares he is required to transfer.

*By the Court.*—Judgment affirmed.

HUGHES, J. (*dissenting*). The plaintiffs sued to enforce specific performance of an option to purchase "not more than fifty per cent of the stock of the corporation so issued to first parties." The trial court ordered judgment requiring the defendant to transfer to the plaintiffs sixty-seven and one-half shares of the stock out of the corporation. The court in the majority opinion affirms the trial court's decision.

I have no quarrel with the presumption that where competent evidence and incompetent evidence are both received it will be assumed that the trial court was influenced solely by

the competent evidence and ignored the incompetent. I do believe, however, that this is a presumption which may be overcome. The trial court in its opinion, referring to the original agreement entered into between Carmelete Keady and Mary McCoy, as sellers, and Elwood May and Peter McCoy, as buyers, said:

"I am satisfied it at all times was the intention of both May and McCoy that each was to have an equal interest. The original purchase agreement of October 16, 1946, bears out my conclusion in that respect. Add to that the testimony of McCoy's sister and the picture is revealed. The surrounding facts and circumstances come close to making the agreement a contract of sale rather than an option."

The testimony of Miss McCoy referred to, which was taken over the objection of the defendant, was in substance:

"Of course I would not sell the business that cheap only that I expected my brother to have a half interest in the business, otherwise I would not sell it."

As pointed out by the defense, the sole question in the case being whether the plaintiffs had exercised the option under which they had a right to acquire up to one half of the stock held by the defendant and his wife, this and similar testimony was incompetent and should not have been received. To say that it is presumed that the trial court was not affected by it necessitates ignoring the statements of the trial court quoted above.

If the court was almost satisfied that the defendant in effect held half of the stock which he purchased from Carmelete Keady and Mary McCoy for plaintiffs, then plaintiffs had very little burden in establishing that they had exercised the option to buy half.

I am convinced that the trial court was influenced by the incompetent evidence to the prejudice of the defendant, and that the defendant is entitled to a new trial upon proper evidence only.