COURT OF APPEALS
DECISION
DATED AND FILED

August 23, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP1730**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021ME171

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF L.A.T.:

KENOSHA COUNTY,

    PETITIONER-RESPONDENT,

  V.

L.A.T.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Kenosha County: JODI L. MEIER, Judge. *Affirmed.*

¶1 LAZAR, J.[1] Linda[2] appeals from orders extending her commitment under WIS. STAT. § 51.20(1)(am) and for involuntary administration of medication under WIS. STAT. § 51.61(1)(g). She further appeals from an order prohibiting the possession of firearms. Linda asserts that the trial court erroneously admitted and relied upon hearsay evidence to find that Linda was dangerous to herself or others. She further asserts that the admission of the hearsay evidence was prejudicial because, without it, Kenosha County presented insufficient evidence to prove that she fell within one of the required statutory definitions of dangerousness.

¶2 The County contends that there was no error and no admission of hearsay from Dr. Marshall Bales, a psychiatrist who met with Linda, and if there had been, there was still sufficient evidence in Linda's own testimony to establish the necessary finding of dangerousness. Finally, it contends that it did not have to establish current dangerousness. That last assertion is mostly incorrect.

¶3 This court concludes that a portion of Bales's testimony (and report) was hearsay that could not be considered by the trial court regarding dangerousness. This court further concludes that, even without the hearsay evidence, sufficient evidence was presented to establish Linda's dangerousness. The description of Linda's pattern of anger and aggressive behavior that caused others to seek law enforcement assistance (or additional inpatient time) was sufficient to establish that others were in reasonable fear of violent behavior and/or serious physical harm at Linda's hands. Moreover, the trial court did not

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] This court refers to the subject individual by a pseudonym (as suggested in her briefing) consistent with WIS. STAT. § 809.19(1)(g), to protect her confidentiality.

erroneously exercise its discretion by concluding that, without recommitment and if treatment were withdrawn, there was a substantial likelihood that Linda would become a proper subject for commitment. *See* WIS. STAT. § 51.20(1)(am). Finally, because this court affirms the trial court's recommitment order, there is no basis to reverse the order for involuntary administration of medication or the order prohibiting the possession of firearms. All of the orders are affirmed.

## BACKGROUND

¶4      Linda was originally committed pursuant to WIS. STAT. ch. 51 and subject to an order for involuntary medication and treatment in November, 2021. On March 10, 2022, the County petitioned for an extension of Linda's commitment. The trial court conducted a contested hearing on Linda's extension on May 2, 2022, at which three witnesses, including Linda, testified.

¶5      First, the County called Bales, the court-appointed psychiatrist who had met with Linda for this latest recommitment and on two prior occasions. Bales testified that he reviewed and relied on his previous report, the report of another doctor from the fall of 2021, crisis event summaries from March and November 2021, and conversations with Linda's father in making his current diagnosis. He noted that in October 2021, Linda had thrown a roll of tape at her father and put her parents in fear, leading to her original commitment. He also testified about an incident on January 5, 2022, in which Linda was yelling and screaming at staff and patients at her nurse practitioner's office and an incident on March 10, 2022, when Linda's father had been concerned for his safety. Finally, Bales testified that there were incidents around the Thanksgiving holiday in 2022 during which Linda was "hyperverbal, loud, irritable, [and displayed] extreme anger." Linda's counsel objected to testimony "as to what others believe

3

concerning … whether [Linda is] mentally ill or not" and what others' attitude was toward Linda.

¶6    Bales concluded that Linda suffered from "a major mental illness" (specifically schizoaffective disorder), that her condition was treatable with medications and outpatient psychiatric care, and that she presented a danger to others if untreated because he "believe[d] she puts others in fear for their safety." He also requested a medication order and stated that he had previously discussed the advantages and disadvantages of medication with Linda and that she told him she was not mentally ill and did not need medication.    Bales's report[3] of examination was admitted into evidence, subject to cross-examination.

¶7    Next, Linda called Dr. Gail Tasch, a psychiatrist who had interviewed her to prepare a report for her present case, which was also admitted into evidence subject to cross-examination.  Tasch agreed that Linda had "a major mental illness" (a personality disorder) treatable with counseling and possibly medication but testified that Linda was not a danger to herself or others.  She indicated she had reviewed Bales's reports, another doctor's report, emergency detention paperwork, and portions of some transcripts from previous hearings.

¶8    Finally, Linda testified.  She confirmed that there had been an incident on January 5, 2022, at her provider's office, which involved screaming over mask wearing.  Linda also discussed the March 2022 incident in which she found her father reading her files, leading to an argument and him calling a crisis

---

[3] The 2022 reports of examination by Dr. Bales and Dr. Tasch that were admitted into evidence are referred to herein as "reports."

line. She also testified regarding the incident that precipitated the original commitment, during which she threw a roll of tape at her father.

¶9 Following the conclusion of evidence and argument, the trial court found that Linda had a mental illness, was a proper subject for treatment, and was dangerous under the second standard based on a "substantial probability of harm to other subject as manifested by evidence of recent … violent behavior." The court entered orders extending Linda's commitment and involuntary medication orders by twelve months. Linda appeals, only challenging whether the County proved dangerousness under WIS. STAT. § 51.20(1) and contending that it did not because the only evidence of dangerousness came from Bales's testimony regarding the incidents with Linda's parents and in her provider's office, which Linda argues is inadmissible hearsay.

¶10 For purposes of this appeal only, Linda does not challenge that there was sufficient evidence for the trial court to find that she was mentally ill and treatable. The sole issue, therefore, is whether the County established the third requirement for recommitment: that Linda was dangerous to herself or others under WIS. STAT. § 51.20(1)(a)(2).

**DISCUSSION**

¶11 Civil commitments require the petitioner (the County)[4] to establish by clear and convincing evidence that the subject individual is mentally ill, a proper subject for treatment, and dangerous to him/herself or others under at least

---

[4] Under WIS. STAT. ch. 51, county governments are given "primary responsibility for the well-being, treatment and care of the mentally ill." WIS. STAT. § 51.42(1)(b).

5

one of five statutory standards. ***Langlade County v. D.J.W.***, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; WIS. STAT. § 51.20(1)(a)1.-2., (13)(e). This is especially critical because "[i]t may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction." ***Addington v. Texas***, 441 U.S. 418, 428 (1979). Upon petition, a trial court may extend a commitment for up to one year. Sec. 51.20(13)(g)1.; ***D.J.W.***, 391 Wis. 2d 231, ¶31.

¶12 With a recommitment, dangerousness may be established under WIS. STAT. § 51.20(1)(am), which recognizes that a person who has been treated and medicated under an initial commitment order "may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior." ***D.J.W.***, 391 Wis. 2d 231, ¶33 (citation omitted). The legislature has clearly recognized that "an individual's behavior might change while receiving treatment," and the statutes thus "provide[] a different avenue for proving dangerousness if the individual has been the subject of treatment for mental illness immediately prior to commencement of the extension proceedings." ***Portage County v. J.W.K.***, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509. Accordingly, § 51.20(1)(am) is an "alternative evidentiary path, reflecting a change in circumstances occasioned by an individual's commitment and treatment." ***J.W.K.***, 386 Wis. 2d 672, ¶19. Regardless, the petitioner must still establish dangerousness under the statute. ***Id.***; *see also* ***D.J.W.***, 391 Wis. 2d 231, ¶34.

¶13 The review of a recommitment order—determining whether the petitioner has met the burden of proof—presents a mixed question of law and fact. ***Waukesha County v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. A trial court's findings of fact are upheld unless they are clearly erroneous, ***id.***, and an appellate court will "accept reasonable inferences from the facts."

*Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). An appellate court may search the record for evidence to support the trial court's findings of fact. *Becker v. Zoschke*, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977). Whether those facts satisfy the statutory standards, however, is a question of law that is reviewed de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

¶14 "The decision to admit or exclude evidence lies within the discretion of the trial court." *Hennig v. Ahearn*, 230 Wis. 2d 149, 178, 601 N.W.2d 14 (Ct. App. 1999). This court will uphold a trial court's discretionary decision if there is a reasonable basis for the determination. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983).

### I. Hearsay can form a basis for an expert opinion, but it is not otherwise admissible.

¶15 Linda first argues that the trial court impermissibly relied upon hearsay evidence from Bales regarding three prior instances when others expressed fear for their safety from her, both in his direct testimony and in his report. The County contends that there was no error and no admission of hearsay by Bales, but if there were, there was still sufficient evidence in Linda's own testimony to support the court's finding of dangerousness.

¶16 Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3). It is generally inadmissible. WIS. STAT. § 908.02. But Bales testified as an expert. Under WIS. STAT. § 907.03, an expert may rely on otherwise inadmissible evidence, such as hearsay, if the evidence is of the type experts typically rely upon to form their opinions. In

the context of WIS. STAT. ch. 51 commitments, testifying expert physicians are expressly permitted to rely upon the review of an individual's treatment records, WIS. STAT. § 51.20(1)(am), and they may use that review as a basis to formulate their opinions as to the three key issues. *See* § 51.20(9)(a)5.

¶17    "It is well settled that it is 'proper for a physician to make a diagnosis based in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others.'" ***Walworth County v. Therese B.***, 2003 WI App 223, ¶8, 267 Wis. 2d 310, 671 N.W.2d 377 (quoting ***Karl v. Employers Ins. of Wausau***, 78 Wis. 2d 284, 299, 254 N.W.2d 255 (1977)). The court in ***Therese B.*** noted "two important qualifications of this rule." ***Id.***, 267 Wis. 2d 310, ¶8. "First, although WIS. STAT. § 907.03 allows an expert to base an opinion on hearsay, it does not transform the hearsay into admissible evidence." ***Therese B.***, 267 Wis. 2d 310, ¶8 (citing ***State v. Watson***, 227 Wis. 2d 167, 198, 595 N.W.2d 403 (1999)). Second, it "does not give license to the proponent of an expert to use the expert solely as a conduit for the hearsay opinions of others." ***Therese B.***, 267 Wis. 2d 310, ¶9 (citing ***State v. Williams***, 2002 WI 58, ¶19, 253 Wis. 2d 99, 644 N.W.2d 919).

¶18    The trial court agreed with the parties that Linda's hearing all "boil[ed] down" to the "dangerousness aspect," and that was the sole issue (other than the medication order) to be addressed in its ruling. The court found Bales's testimony to be more credible than Tasch's or, by implication, Linda's. The court relied upon several incidents in finding a troubling pattern of dangerousness, including: (1) the October 2021 tape-throwing incident at Linda's parents' home; (2) the January 2022 yelling incident at a provider's office; and (3) the altercation with Linda's father in March 2022. The court concluded that each of these contributed to a pattern of dangerous behavior that placed others "in reasonable

fear of violent behavior and serious physical harm to them as evidenced by a recent overt act." And, therefore, these incidents were the basis for the court's orders.[5]

¶19 These incidents need to be substantiated by something other than hearsay evidence to properly be considered as bases for Linda's dangerousness. Each was testified to, at least in part, by all three witnesses, and each is mentioned, again at least in part, in the reports by Bales and Tasch that were admitted into evidence. Linda asserts that if Bales's hearsay testimony is excluded, insufficient evidence remains to support the trial court's orders. This court will address the evidence supporting each incident below.

## A. The October 2021 tape-throwing incident

¶20 The trial court described this incident as the first of several that formed a pattern of dangerous behavior: "[T]here's a pattern here from this issue on October of 2021 that resulted in the initial [WIS. STAT.] Chapter 51 commitment order that [Linda] threw tape at her father missing his head." All three witnesses and both reports mention this incident.

¶21 Tasch testified that Linda was "enraged" and threw an object at her father, and although no one was hurt, Tasch conceded that throwing an item "certainly has the potential to be dangerous." In Tasch's report, she described this incident in a section summarizing information obtained directly from Linda:

---

[5] The trial court also relied on an alleged kicking incident at Winnebago Mental Health Institute. This court agrees with Linda that the County did not provide a reasonable evidentiary basis to support a finding that this incident occurred, so it will not be discussed further.

9

> She has been aggressive towards her parents, believing they are lying about her. She threw an item at her father. She allegedly pushed her mother. She has a history of becoming angry and screaming and yelling.

This summary is not hearsay because Linda was the source of the information. Statements made by a party—or, in this case, the subject individual—are not hearsay and are admissible. *See* WIS. STAT. § 908.01(4)(b)1.; ***State ex rel. Kalt v. Board of Fire and Police Comm'rs for Milwaukee***, 145 Wis. 2d 504, 516, 427 N.W.2d 408 (Ct. App. 1988).

¶22     Linda also testified in detail about the lead up to this incident and how her parents believed she was mocking them. She denied pushing her mother, but she admitted that she threw masking tape at her father. This is not hearsay. *See* WIS. STAT. § 908.01(3).

¶23     Finally, Bales addressed this tape-throwing incident in his testimony (as well as in his report[6]):

> [BALES:] Well, she was detained on October 13th, 2021, and she had been aggressive with her parents calling them

---

[6] This incident was mentioned in Bales's report in a section that summarizes "relevant information *obtained from the subject individual* pertaining to past history and present events" (emphasis added) as follows:

> She had been aggressive with her parents over "lies." She had thrown an item at her father. She had broken items. She had locked her parents out and put them in fear for their safety. She had pushed her mother. She was "being nasty" to her parents—screaming, yelling, and making baseless and untrue accusations over "everything." She had thought her family, attorneys, and the government were against her. She had been paranoid, manic, psychotic, and disruptive. While at [Winnebago Mental Health Institute], she had attempted to hit staff and had been disruptive. When [Bales] saw her in 2017 at [Winnebago Mental Health Institute], she had a similar presentation.

liars. She had put them in fear. She had thrown an item and ultimately she was detained.

[COUNSEL:] And when you indicate she had thrown an item had she thrown that at an individual?

[BALES:] I—I got different stories, but basically she put her parents in fear and she had thrown a roll of tape at one of the parents.

¶24 At this point, Linda's counsel objected on the grounds that "placing [her] parents in fear" was hearsay and that the County should call the parents to testify as to whether they were in fear. Counsel further objected that while Bales could rely on collateral sources to form his opinion, that evidence could not be introduced to establish dangerousness. The trial court overruled the objection without explanation. This court presumes that the trial court was cognizant of the relevant law and did not intend to rely upon inadmissible hearsay in its dangerousness determinations. *See McCoy v. May*, 255 Wis. 20, 25, 38 N.W.2d 15 (1949) ("The general rule is that while rules of evidence apply on actions tried to the court it will be presumed if there is proper evidence to support the findings of the trial court that the court disregarded any evidence improperly admitted.").

¶25 Bales's testimony, however, that Linda's parents were in fear for their safety is indeed hearsay. The trial court could not rely upon that in making its conclusions. "While experts may rely on inadmissible evidence in forming opinions … the underlying evidence is still inadmissible." *S.Y. v. Eau Claire County*, 156 Wis. 2d 317, 327, 457 N.W.2d 326 (Ct. App. 1990).

**B. The January 2022 yelling incident at a provider's office**

¶26 The trial court relied on the January, 2022 incident at Linda's provider's office as a basis for its finding of dangerousness, stating that:

11

> [I]n January there was an incident at the doctor's office where whether it was about a mask or something else for that matter [Linda] got about a foot away from somebody and was screaming and yelling at them, and it sounds like that is what resulted in the next stay at Winnebago.

¶27    Bales testified about this incident in detail: "[O]n January 5th the records indicate that she had been at her nurse practitioner office and was yelling at staff and patients. One time she was a foot away … from them yelling, screaming, and the police were called." In his report derived from collateral sources, Bales notes that Linda's conduct was unprovoked, that she couldn't be redirected, and that "feeling threatened," the staff called the police. Tasch mentions this incident in her report, but she, too, obtained that information through a collateral source.

¶28    The testimony that Linda was yelling "a foot away" from the staff at the provider's office was made by Bales and derived not from his conversation with Linda but from collateral sources. Thus, while a proper basis for his opinion on mental illness, that portion of his testimony is not admissible regarding dangerousness. *See S.Y.*, 156 Wis. 2d at 327; WIS. STAT. § 907.03. The same applies to Tasch's statements.

¶29    But Linda also testified about the incident. She said it started in the waiting room, and people started yelling at her when she inadvertently lowered her mask to touch her nose. Linda stated that "[t]hree people start[ed] yelling at [her] so [she] start[ed] yelling." She did not deny that the police were called. All of Linda's testimony regarding the incident is admissible.

### C. The March 2022 altercation with her father

¶30    The trial court mentioned the final specific incident underlying its dangerousness finding: "[I]n March there was some altercation. Sounds to be verbal. I didn't hear much of anything else about that with her father and Crisis was called."

¶31    Bales testified that "[t]he records indicate that [Linda] had been at her parents' on March 10th of this year and they'd been [in] some kind of argument and the father was concerned for his safety. There was no injuries. There was no physical assault and, but that's what the record indicates." His testimony as to Linda's parents' concerns for their safety was not admissible.

¶32    Tasch testified that "[o]n March 10th she had a verbal altercation with her father on the phone." Tasch also mentions this incident in her report, but she, too, obtained that information through a collateral source.

¶33    Linda also testified that she argued with her father in March due to him looking at her confidential files. She admitted her father called the crisis line due to that argument. Again, all of Linda's testimony on this incident is admissible.

### D. The overall pattern of anger and aggression

¶34    In addition to the specific incidents relied upon by the trial court, that court further heard and relied upon testimony regarding Linda's ongoing pattern of anger and aggressive behavior. Both Bales and Tasch personally interviewed Linda for their examination reports prior to the 2022 hearing. Bales

described his personal, firsthand observations[7] due to Linda's behavior at the interview:

> [BALES:] Well, it was particularly notable that she taped the interview and came across as paranoid and I've done many of these and I believe this is the first time someone has taped a conversation. I—I was uncomfortable with that.... [B]ut that reflects I believe symptoms. Paranoia, distrust, antagonism. Thinking everybody's liars including me and the Court, the police, her parents, those around her. Just really problematic I believe.
>
> [COUNSEL:] How was her thought process and content during your discussion?
>
> [BALES:] Mostly clear, but again, indications of irritability, lability, paranoia, distrust, and—and this by the way is more than just somebody with an anger issue in my opinion. [R.105:14:10- 15:1]

Bales opined that, without this recommitment, Linda "would be even more threatening and would be either dangerous or in danger."

---

[7] Bales also made note, in his report of examination, of his personal observations of Linda during his interview. They included the following statements:

> [Linda] was hostile, accusatory, and antagonistic during the videoconference. She taped the entire conversation. She also accused me of being drunk.… She had manic, paranoid, and dysphoric components to her presentation. Although she could think clearly, she made paranoid and delusional comments. She called everyone, including her family and me, liars….
>
> ….
>
> [S]he was irritable, manic, hostile and accusatory….
>
> ….
>
> [Linda] could not reasonably or rationally discuss psychotropics.... She yelled and interrupted me.

¶35    Bales also testified that "this threatening behavior, putting female[s] in fear is a pattern."   He opined in his report that Linda (1) "has been on commitment with Kenosha County for several months," (2) "has continued to remain symptomatic, including paranoid, manic, dysphoric, and hostile toward her family, providers and others," and (3) "has continued to lack insight."  He further testified that he had difficulty talking to Linda during their latest interview/examination.  He could not get into some topics.  "She was simply too uncooperative."

¶36    Tasch testified that, in her opinion, Linda "does not pose a danger to herself or others."   But she agreed that Linda "had the history of verbal aggression" and agreed that she was "aware [that some] of these verbal or physical actions" by Linda "caused fear to her parents or to people in the doctor's office who called law enforcement."   Tasch agreed that Linda showed aggressive behavior towards her parents and opined that "[a]t times [Linda's] anger ha[s] been out of control."   Still, Tasch disagreed that Linda was dangerous, stating that:

> She has difficulty controlling her anger which in my opinion does not meet the standard for imminent danger. She needs help.  She knows she needs help.  She's willing to get help for those personality problems she has and I'm—I'm sure her parents felt fearful as I said, but a mental health commitment is quite stern and the loss of rights. And I think that it would be in [Linda's] best interest to get the help she needs so she can handle her anger and her feelings and act in an appropriate manner which I think she has the potential to do and is willing to do.

## II.    Even excluding hearsay testimony, there was sufficient evidence to support a finding of dangerousness.

¶37    After outlining the incidents and altercations described above and noting Linda's pattern of anger and yelling at others, the trial court summarized its rationale for concluding that Linda was statutorily dangerous as follows:

So that's the pattern that I understand from the testimony that has been presented and when I look at the standards to see if the dangerousness aspect was met ....

But what the Court looks at as far as dangerous that I do believe that there's clear and convincing evidence on is the substantial probability of harm to other subject[s] as manifested by evidence of recent it says homicidal or other violent behavior.

Homicidal is not obviously the case here or other violent behavior or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them as evidenced by a recent overt act. So we have the overt act from October which kind of started all of this in place.

Then we have getting in someone's face yelling and screaming at them. Dr. Tasch kind of characterizes it as just somebody's got uncontrollable anger, but I think it's common sense that if somebody came up to I look at it for me to anybody and start screaming in their face at extremely close proximity that that would cause someone to be fearful of harm, and that's just how I see it.

And it happened to be it wasn't just something that was brushed off because it—it wound up where [Linda] wound up back in Winnebago. I think that is a reasonable fear of some kind of violent behavior, serious physical harm for someone to come up and scream at you, yell at you, and have that uncontrollable anger at again such a close, close proximity.

And that would be very threatening and also that Dr. Bales further testified that based on a review of [Linda's] treatment record that there is a substantial likelihood that [Linda] would become a proper subject for commitment under this standard if treatment were withdrawn.

¶38 Linda contends that without the inadmissible hearsay, there was insufficient evidence to support a dangerousness finding and the subsequent recommitment. She is incorrect. While some of the evidence the trial court referred to in its oral ruling was inadmissible hearsay (in particular that Linda had been in "close, close proximity" and screaming "in someone's face" at the

16

provider's office), there was an accumulation of evidence that was properly admitted and considered.

¶39    Evidence of current dangerousness in a recommitment is necessary, but "neither the statute nor the applicable case law requires an expert or [trial] court to speculate on the precise course of an individual's impending decompensation by identifying specific *future* dangerous acts or omissions the individual might theoretically undertake without treatment." *Winnebago County v. S.H.*, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761. Moreover, "[d]angerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions (provided, of course, that there is a proper foundation for the latter)." *Id.*

¶40    With respect to the tape-throwing incident, the trial court heard[8] the following admissible testimony: (1) Linda was aggressive with her parents over their "lies"; (2) Linda was being "nasty" to her parents and screamed and yelled; (3) Linda threw a roll of tape at her father; and (4) law enforcement was called. With respect to the January 2022 yelling incident at the provider's office, Linda admitted that she yelled at staff and that the police were called to the office. There is no evidence as to how close she was when she yelled. But, the trial court was presented with evidence (some directly from Linda) that Linda engaged in a yelling "argument that erupted over mask wearing" that progressed to the point

---

[8] On a recommitment, dangerousness must be established anew. *See Portage County. v. J.W.K.*, 2019 WI 54, ¶21, 386 Wis. 2d 672, 927 N.W.2d 509 ("Each order must independently be based upon current, dual findings of mental illness and dangerousness; accordingly, the sufficiency of the evidence supporting prior orders has no impact on any subsequent order.").

where office staff were compelled to call the police. With respect to the March 2022 altercation with her father, Linda admitted to the incident and stated that her father called the crisis line.

¶41 Finally, both Bales and Tasch testified with respect to Linda's overall pattern of anger and aggression. Bales testified and/or noted in his report that, based on his personal observations of Linda, she was hostile, accusatory, irritable, distrustful, manic, paranoid, uncooperative, and had indications of lability.[9] He wrote that this was "more than just somebody with an anger issue." Tasch wrote that there was a history of verbal aggression and that, at times, Linda's anger was out of control. Based upon those similar observations, however, each physician had a different opinion as to Linda's dangerousness if her medication was withdrawn. Tasch stated that Linda's out-of-control anger "caused fear to her parents or to people in the doctor's office who called law enforcement" but then opined that this did not meet the statutory definition of dangerousness required for a recommitment. Bales disagreed, concluding that in his opinion Linda caused fear in her parents and others that rose to the level of dangerousness.

¶42 Both Bales and Tasch testified that they believed Linda's parents were in fear for their safety. Tasch admitted that Linda acted aggressively toward her parents and that, at times, her anger was out of control. Bales testified that Linda suffers from more than just an anger issue. In contrast to the testimony in *S.Y.*, where the testifying physician had only limited contact with the subject

---

[9] The Merriam-Webster Dictionary defines "labile" as "readily or continually undergoing chemical, physical, or biological change or breakdown: UNSTABLE." *Labile*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/labile (last visited Aug. 1, 2023).

individual and based almost all of his testimony on medical records, 156 Wis. 2d at 327, here, both Bales and Tasch spent time with Linda before the hearing, and Bales had interviewed Linda on two previous occasions.

¶43   It was the obligation of the trial court, as the finder of fact, to sort out these opposing opinions, weigh the witnesses' credibility and determine whether the admissible evidence was sufficient to establish that "others are placed in reasonable fear of violent behavior and serious physical harm to them [by Linda], as evidenced by a recent overt act, attempt or threat to do serious physical harm." *See* WIS. STAT. § 51.20(1)(a)2.b.   Based upon all of the evidence described above and upon a determination that Bales was a more credible expert than Tasch, it was not unreasonable for the court to find the County had met its burden of proof on this last issue.   There was, thus, a reasonable basis for the court's discretionary conclusion that Linda met the statutory requirement of dangerousness to herself or others.

### III. The dangerousness must be current but need not involve actual harm to the individual or another person.

¶44   The parties agree that, because this is a recommitment, there need not be "current" examples of dangerousness.   Rather, WIS. STAT. § 51.20(1)(am) provides that "the requirements of a recent overt act, attempt or threat to act ... may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn."   The County must, therefore, establish current dangerousness under that "alternative evidentiary path." *See* *J.W.K.*, 386 Wis. 2d 672, ¶19.   The trial court appropriately based its ruling on this understanding of the law, stating that "a person can be dangerous even if it doesn't

actually result in harm to someone" and that the standards under WIS. STAT. ch. 51 do not "require actual harm."

¶45 Linda asserts that merely displaying symptoms of mental illness "is irrelevant if that display does not amount to dangerousness." She is correct. She also asserts that the trial court cannot find a link between a failure to medicate and dangerousness in her case. In that, she is incorrect. As detailed above, the trial court examined incidents where Linda's anger resulted in calls to the police or to a crisis line because others were in fear of her violence. The court also looked to the continuing pattern of Linda's anger and aggression—even while she was medicated—and determined that the pattern led to other individuals feeling it necessary to take steps to bring in law enforcement. The discretionary decision that Linda was dangerous is reasonably based upon the record, the testimony and opinions of experts, and Linda's own testimony.

¶46 It is not necessary for a witness or expert to identify specific future dangerous acts by Linda or to state with specificity what type of decompensation will happen (and when it will happen) if current medication is terminated. *S.H.*, 393 Wis. 2d 511, ¶13. But, the trial court may properly consider Linda's precommitment (or in this case prerecommitment) behavior and "couple" that with Bales's informed opinions and predictions that "without a commitment in place, [Linda] would stop her medications and treatment and further decompensate," that Linda "has been dangerous in the ways noted," and that in his "opinion with a reasonable degree of medical certainty that she does meet the criteria for a 12-month extension of her [WIS. STAT.] Chapter 51 commitment with an involuntary medication order." The court weighed the competing expert opinions and agreed with Bales that Linda would decompensate if the commitment was not extended and the medication order withdrawn. The court concluded that, in those

circumstances, there was a substantial likelihood that Linda would become a proper subject for recommitment. *See* WIS. STAT. § 51.20(1)(am).

## CONCLUSION

¶47 This court concludes that, even without the hearsay evidence, sufficient evidence was presented to establish Linda's dangerousness based upon the cumulative description and pattern of several acts where Linda's anger and aggressive behavior was sufficient to establish that others were in reasonable fear of violent behavior and/or serious physical harm at Linda's hands and that if the recommitment was not extended and treatment withdrawn, there was a substantial likelihood that Linda would become a proper subject for recommitment.

¶48 Accordingly, this court affirms, in its entirety, the trial court's order committing Linda and the corresponding order for involuntary administration of medication and treatment and the order prohibiting the possession of firearms.

> *By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.